## SHELTON & COMPANY *vs.* ELLIS *et al.*

If, in making a contract of sale, a mistake has been made by one party, and a fraudulent advantage has been knowingly taken of this mistake by the opposite party, to his gain and the serious detriment and injury of the party making the mistake, a court of equity will grant appropriate relief.

(*a.*) Upon the questions of fact the evidence was conflicting, and there was no abuse of discretion in holding that the case should be passed upon by a jury.

April 24, 1883.

Equity. Fraud. Contracts. Before Judge HILLYER. Fulton County. At Chambers. April 28, 1882.

Ellis filed his bill against Garland, Shelton and Stokes, alleging, in brief, as follows: Complainant was employed by several railroads, among them the Western and Atlantic Railroad, to compile what are known as rate sheets, giving the cost of tickets between different points. In publishing this rate sheet, the fare from Atlanta, Georgia, to Rogers, Arkansas, was, by mistake, printed $21.25, when it should have been $36.70. The defendants having discovered this mistake, and intending to deceive and defraud complainant, went to Adair, the ticket agent of the Western and Atlantic Railroad, and Garland represented that he desired ten tickets for laborers or emigrants, and purchased that number at the price of $21.25

each.   This occurred about midnight on April 15, 1882.
On the next morning, during the absence of Adair, Gar-
land, through himself or his confederates, purchased from
Plane, Adair's assistant, fifty-five more of these tickets,
again making the false representations as to laborers or
emigrants.   Complainant is responsible to the railroad for
the mistake in the rate sheet.   He offered to refund the
money paid for the tickets, but the offer was refused.   De-
fendants are trying to sell the tickets.   Garland is insol-
vent.   Defendants knew of the mistake in the rate sheet,
and the presentations stated were falsely and fraudulently
made to procure the tickets.   The prayer was for an in-
junction to prevent the sale of the tickets and for the
appointment of a receiver to hold them.   By amendment,
the Western and Atlantic Railroad was made a party
complainant.

Defendants answered, in brief, as follows : Shelton and
Stokes are partners, under the name of Shelton & Com-
pany.   They are ticket brokers, and a portion of their
business is to purchase cheap tickets and sell them for higher
prices.   Where a through ticket is for passage over a long
route, they can frequently make a profit by selling passage
to some point on the line at an advanced rate and retain-
ing the balance of the ticket, through their connections in
different cities.   The railroads object to selling tickets to
the brokers, and especially does the Western and Atlantic
do so, its agent being unfriendly to Shelton & Company.
If the railroads discover that the brokers are using partic-
ular tickets to any considerable extent, they put the price
up.   The different railroads in Atlanta issue a monthly
rate sheet, showing prices and the character of tickets from
Atlanta to all points, and these prices are changed from
time to time.   These rate sheets are usually furnished to
the brokers by some passenger agent, and the brokers de-
termine from it what tickets they can use advantageously.
They so determined in regard to the tickets from Atlanta
to Rogers, Arkansas.   Garland was a travelling salesman,

and when in Atlanta often called on Shelton & Company. He so called on April 5, 1882, and Shelton & Company, after explaining to him the difficulty which they experienced in buying tickets, asked him to purchase for them some tickets from Atlanta to Rogers. He was not familiar with the rate sheet or the business of the brokers. He would have bought the tickets on the afternoon of April 5, instead of at night, had the money been furnished him. He went to the ticket office at the regular hour for opening the same, about eleven and one-half o'clock P. M., and asked for tickets to Rogers, Arkansas, what was their price, and if they were first-class and unlimited. The agent replied in the affirmative, and stated the price to be $21.25 each. Garland called for ten. The agent said that there must be some mistake in the price. Garland told him to look well and not to receive his money and then say that there was something wrong about the tickets. The agent examined the rate sheets and said that the price was so stated there, and his instructions were to sell by them. He also looked into a book, and said that some of those tickets had been sold. While preparing the tickets for delivery, he asked Garland what he wanted with so many tickets to one point. The latter responded, " That is a leading question and ruled out of court." As he delivered the tickets, the agent again asked Garland the same question. The latter considered the question impertinent, but not desiring to answer harshly, replied in a jocular manner, " I have gone into a combination to settle up the whole of northwestern Arkansas." The tickets and money had then been delivered and were being counted. Garland proposed to buy more tickets that night, but the agent said that it was late and he wanted to go home, but Garland could get them next morning. On the next morning, Garland went to the ticket office and purchased from the assistant agent fifty-five more of these tickets. While he was purchasing them, the agent of a line of railroads connecting with the same point, but dif-

ferent from that over which Garland was purchasing tickets, proposed to sell him tickets at the same price, looking at the rate sheet to ascertain the price. After the tickets were delivered, but while still at the ticket window, the conversation was continued, and in the course of it, jocular remarks, similar to that stated above about settling northwestern Arkansas, were made. Garland proposed to buy all the remaining tickets to Rogers which the agent had, but on returning later during the same day, he was informed that the price was $31.00, and thereupon declined to buy. The sales were not made on account of any misrepresentations to the agents, but were made from their own rate sheets; nor were any false or fraudulent representations made; nor did the defendants know that there was any mistake in the rate sheets. Shelton & Company merely discovered that the tickets were cheap, and decided that they could use them advantageously. The rate sheets for five consecutive months stated the same price for these tickets.

The court granted a temporary injunction, and appointed a receiver. Defendants failed to deliver the tickets to him, and a proceeding to attach them was begun. In response it was shown that the tickets were in the hands of one Wilson, who had furnished the money for their purchase. He was made a party and ordered to deliver them to the receiver. Conflicting affidavits, which need not be set out here, were introduced in support of the bill and answer. Defendants excepted to the grant of the injunction and appointment of the receiver.

MYNATT & HOWELL, for plaintiffs in error.

W. F. WRIGHT, for defendants.

HALL, Justice.

There is no question made here as to the propriety of the orders passed by his honor, the presiding judge, if the

case made by the bill entitles the complainants to the relief prayed. Upon the question made there was a conflict of evidence; there was no abuse of discretion, if the law authorized the interposition of the judge. The order appointing the receiver and directing the injunction carefully preserved the rights of all the parties to the final hearing of the cause.

The first and only question made which we shall consider and determine, is whether appropriate relief can be granted by a court of equity, in a case where there has been a mistake on one side, and it is alleged that a fraudulent advantage has been knowingly taken of this mistake by the opposite party, to his gain and to the serious detriment and injury of the party making the mistake. The question is thus broadly stated, to meet the views presented by counsel in the case.

In *Wyche et al. vs. Greene*, 26 *Ga.*, 415, this court held that what is a mistake on one side and a fraud on the other is as much the subject of correction as if it were a mistake on both sides, and in delivering the opinion of the court, Benning, J.; (at p. 122) said: "The court's charge that a mistake, to be the subject of correction, must be a mistake in which all the parties to the contract participate, was too absolute. If one of the parties to a contract is mistaken in a matter, and the others know that he is and do not apprise him of it, yet the mistake, though not one on their part, is the subject of correction. The case becomes one in which there is a mistake in one of the parties to the contract and a fraud in the others. Such a case is even more readily the subject of relief, at his instance, than is a case in which there is nothing but a mistake, although that be a mistake extending to all the parties." There is nothing that we are aware of, either in the Code or any subsequent decision of this court, modifying the law as here declared. On the other hand, we think there is much confirming the view here taken. Compare with this Code §§3117, 3119 to 3126, both inclusive, and 3180. The

conditions upon which relief will be granted or denied must, under the sections of the Code and the cases cited under them, depend in large measure upon the circumstances of each particular case, and upon all the facts developed, which should be passed upon by the jury at the final hearing, and ought not to be too closely scrutinized or evenly balanced in these preliminary proceedings. All that the judge decides at that stage of the cause is that there is enough developed to carry the case to the jury, whose exclusive province it is to determine the force and effect of facts as applied to the law given them in charge by the court. This is all that the judge has undertaken in this case.

Judgment affirmed.