BRANCH vs. COOPER.

1. Where there was a mistake in partnership books, in consequence of which the interest of the selling partner in the bulk of the partnership assets seemed much larger than it was, and the mistake was unknown to both partners, and neither was in *laches* in respect to its discovery, and where the purchase by one from the other, of such interest, was made at a price evidently based on the erroneous state of the books, the price being paid in full before the mistake was discovered, the consequences of the mistake ought in equity to be corrected if it can be done without injustice to the selling partner.

2. Whether, after it is too late for a rescission, the correction can be made by refunding a part of the purchase price, and if so, how much ought to be refunded, are questions depending upon natural justice and equity, under all the circumstances, and these may be treated as questions of fact for determination by a jury.

3. Suggestion that the case in its totality be submitted to the jury; or if either party objects, under code, §4206, that amongst the specific questions submitted, the above be included.

September 16, 1889.

Partnership.  Mistake.  *Laches.*  Sales.  Rescission.
Equity.  Practice.  Before Judge ADAMS.  Chatham
superior court.  June term, 1888.

Branch & Cooper had been partners in carrying on a
general grocery business since November 5th, 1872.
On June 30th, 1886, the end of a fiscal year, the books
of the firm were balanced and an account of stock
taken, the bad debts being stricken from the balance
sheet.  On the books it appeared that the amount to the
credit of Branch was $17,721.71, and to the credit of
Cooper $10,542.68.  These books had been kept for
twelve years by the same bookkeeper, and both part-
ners had full access to them, though the bookkeeper, as
he testified, generally consulted Cooper as to any ques-
tion which would arise in the course of business.  Per-
haps Cooper took a more active part in the manage-
ment of the business, though Branch was constantly in
the store and exercised such control as he chose.  About
the middle of July, 1886, negotiations looking to a dis-
solution were begun.  Some change in the business was
proposed by Branch, and Cooper, having different
views, suggested a separation.  Branch replied that he
was ready to entertain a proposition looking thereto.
Cooper offered to give $15,000 for Branch's interest or
take $10,000 for his own, he having drawn out a larger
amount than Branch.  Branch asked if the offer in-
cluded the store-lease, stocks, bonds and contracts.
Cooper replied yes, it included everything that belonged
to the firm, except the right for Cooper to go into busi-
ness again.  Branch took the matter under advisement
for a day or two and then accepted the latter alterna-
tive of the offer, and on July 31st, 1886, a dissolution
by mutual consent was effected, Branch paying Cooper
$10,000 and taking a bill of sale to " all of the share,

title, interest, property and possession whatsoever, in law or in equity," of Cooper, " of, in or to the stock in trade, property, effects, notes, accounts, articles and things of every kind and description of the firm of Branch & Cooper," including the lease of the building.

The books contained an error consisting in the entry of $10,720.17 worth of stocks and bonds, purchased in 1882, upon the inventory of merchandise of June, 1883, and continuing through the inventories of next three years. The amount was charged to the merchandise account on the ledger. The items had previously been entered therein upon the property account; so that there were two charges of the same items. The amount passed as a credit on the account of profit and loss on the ledger, by making closing entries as profits to the credit of the partners. Instead of $17,721.71 and $10,542.68, the amounts to the credit of the partners, after deducting the amount of the repeated entry, would have been $12,361.62 and $5,182.60 respectively. The error was entirely unknown to both of them and to the bookkeeper until about a year after the dissolution. Upon the inventory book, containing an itemized statement of the property of the firm (except debts due it), both partners made entries; the first entry of the stocks and bonds thereon to the account of merchandise was in the handwriting of Cooper; in 1886, Branch put the same items down there. The inventory book also contained entries of cash balances, because there was no cash account on the ledger. It contained everything but the lease. For some years before the dissolution, the business had paid each partner about $5,000 annually. Cooper had some experience in bookkeeping; Branch not so much. Branch continued the business at the old stand after the dissolution. Cooper went into business for himself again, after the delay of about five months.

After the mistake was discovered, Branch called Cooper's attention to it and requested payment of $5,360.08, or half of the amount of the repeated entry. This was refused. Afterwards his counsel asked Cooper if he would consent to submit the matter to arbitration in order to avoid litigation; this also was refused, because the matters were legal questions which the courts only could decide, though Cooper deprecated litigation. Branch then filed his bill, which contained, among others, the following allegations:

By the articles of partnership under which the firm began business, it was, among other things, provided that in case of disagreement in reference to the termination of the partnership, or to anything arising in the course of the business, said disagreement should be settled by, arbitrators; also that the usual books and papers should be kept at the usual place of business and all proper entries made therein. Relying upon the entire correctness of the books, and having no reason to question the same, Branch accepted Cooper's offer in the manner above stated. He left the supervision and care of the books to Cooper, trusting to his experience and knowledge, and being unable, from his own lack of experience, to detect any error therein. At the time of his purchase, he was laboring under a mistake as to the true value of the interest of Cooper, and would not have consented to pay $10,000 had he known the truth as afterwards ascertained. Defendant also either was laboring under the same mistake, so that it became mutual, or, if he was aware of it, took advantage of the confidence of Branch, and by his silence was guilty of fraud. Waiving discovery, it is prayed that the books be examined and an accounting had and the mistake corrected; that the defendant be required to refund all in his hands in excess of the true value of

his interest: and that the contract of sale to that extent be rescinded; also for general relief and *subpœna.*

Such part of Cooper's answer as is material to be here stated, is as follows: The claim made by Branch is not affected by the portions of the articles of partnership to which he refers, and defendant has never in any way agreed to submit to arbitration any issue now made by Branch. The account and statement on the books were not taken, used or referred to in the negotiations which resulted in Branch's buying Cooper's interest, but the account and statement were made in accordance with a rule of the firm, solely because it was the end of the fiscal year. Defendant had no special supervision over the books, and Branch had as full power and access thereto and the same control over the bookkeeper that defendant had. The books were not complicated, and there was no reason why complainant could not, at any time, have learned the condition of the business, as he was, equally with defendant, in possession of all the facts, and was in no wise imposed upon or misled. If there were a mistake in the books, it would not constitute a mistake of fact or furnish ground for relief to Branch against a bargain fairly made, with no concealment or fraud and with a full knowledge of the facts. Defendant's interest was fully worth $10,000, even if it be true that the books were erroneously kept; he would not have taken any less had he known of such error, as he left to Branch a prosperous business established largely by the efforts of defendant. Complainant did not buy defendant's account with the firm, but his entire interest in its assets. If the error had constituted such a mistake of fact as might ordinarily be relievable, the *laches* of Branch and the impossibility of restoring the *status quo* of the parties would prevent the granting of the relief prayed for.

Branch testified that in paying $10,000 for Cooper's interest, he did so entirely on the account as it erroneously stood on the ledger, and went by the statement made up from the books, thinking it was correct and having no reason to question it, and having nothing else to go by, though nothing was said and no reference made about the books when they traded; and that he would not have given more than $4,800 for Cooper's interest had he known of the true state of the case. Could not mention any particular assets he had thought he was getting which he did not get, but could say the assets were credited twice. Cooper testified that there was no difference between the partners at the time of dissolution to be referred to arbitrators under the articles of partnership; that in retiring, he reserved nothing whatever save the right to go into business again; that he considered his interest worth the sum he received, and Branch's what he offered for it, and still does, despite the error, and would not, had he known of such error, have taken less, because the business, which he had largely built up, was so profitable; that he would have offered Branch the same even if he had known of the error, because he would have considered that he could have made it up in twelve months; and that he did not understand that the putting of the items upon the inventory book was itself a mistake; he had always put thereon everything in the way of property, no matter of what kind, and so did other bookkeepers; but the mistake was made in not closing the property account as it stood on the ledger. Knew what the assets were at the time of the sale, and presumed Branch also knew; he had the same opportunity of knowing the true *status.* The only result of the error was, to make the accounts of the partners appear so much larger than they were. Knew of nothing in

it that prevented Branch from knowing exactly what he was buying. The property and everything with it—inventory-book, stock, cash account, etc.—all were there.

The case was submitted to the jury upon special questions formulated by the court and by the counsel for each side; and on the findings rendered, a motion by the defendant for a decree in his favor was granted. The plaintiff excepted to this, as well as to the refusal of a new trial for which he afterwards moved.

GEORGE A. MERCER, for plaintiff.

DENMARK & ADAMS, for defendant

BLECKLEY, Chief Justice.

1. Under the evidence, there is no possible doubt that upon taking an account of stock of the partnership on June 30th, 1886, entries were made in the partnership books showing that Branch had an interest in the partnership assets to the amount of $17,721.71, and that Cooper had a like interest to the amount of $10,542.68. It is equally certain that in consequence of a mistake in computing the assets, resulting from entering and counting certain stocks, bonds, etc. twice, these sums did not correctly measure the interest of either partner, the amount to the credit of each being too large by five thousand dollars or upwards. Both partners were ignorant of the mistake, and so far as appears, neither of them had cause to suspect that the books were not absolutely correct. Inasmuch as the difference between their individual accounts rendered their clear net interest in the assets unequal, there was no measure of the interest of each, at least as to the bulk of the assets, except the books. The books constituted the partnership register by which the interest of each partner in the regular

course of business would be measured; and it is clear, therefore, that either or both partners had a right to look to the books, and may have been expected to do so, as a basis for computing the value of the interest of either when offered for sale. As there was no reason to suspect any error in the books, we can see no cause for attributing to Branch *laches* or neglect in not looking outside or beyond them, or in accepting them as correct without a special examination to verify them. Whether Cooper negotiated on the basis of the books or not, he must have known that Branch, as a rational man, would resort to them as a basis, and it is clear from the evidence that Branch did so; that in making his contract for the purchase of Cooper's interest, he was influenced by the books, treating them as correct. As they were not correct, but contained a material mistake of which both parties were ignorant, and that mistake influenced Branch in making the contract, it was a mutual mistake, whether it influenced Cooper or not. He himself testifies that he thought the books correct, had no doubt of it, and was astonished afterwards up to the point of incredulity when he heard that the error had been discovered. He was so startled that he became ill. One fact testified to by him is decisive upon the intention of both parties to consummate their bargain, as finally closed between them, upon the basis of the business as it stood on June 30th, 1886. The contract for the sale of Cooper's interest was made about the middle of the following July, and the dissolution was to take place on the 31st of July. Cooper testifies that in the final contract it was agreed that he should remain until the end of the month, and should receive as his compensation for the business of July $400. This shows that his interest as it existed on the 30th of June, when the books were made up, was the real subject-

matter of the sale, and that there was a separate and, distinct stipulation covering the firm operations for the whole of July, by which his income for that month was fixed definitely at $400, about the twelfth part of his half of the profits made by the firm in the preceding year, ending June 30th.

The result of the mistake being to cause Branch to contract for the purchase of Cooper's interest, and to pay for it at a price several thousand dollars in excess of its real value, and in excess of the value which would have been shown by the books had they been correct, there can be no doubt that apart from the mere form and shell of contract, Cooper received more for his interest than in equity and good conscience he was entitled to. Had the facts been as both parties thought them to be, Branch would have had value received for all he paid out, but the mistake of fact as to the *quantum* of Cooper's interest in the bulk of the assets caused Branch to promise and to pay several thousand dollars for which he got nothing. If the consequences of the mistake can be repaired by the resources of a court of equity, they certainly ought to be. Not to be able to afford some remedy in such a case would, to use the language of Chancellor Kent after Lord Eldon, be "a great defect in the moral jurisdiction of the court."

2. It is obvious that the mistake was discovered too late to admit of a rescission of the contract, the discovery not being made until the books were closed for the next year, which was done May 31st, 1887, a month earlier than had been customary whilst the firm existed and transacted business. The discovery was confirmed and made certain by the services of an expert employed for the purpose, whose examination was completed early in August. Before any one had knowledge or intimation of the mistake, the whole purchase price had been

paid in full, and Cooper had incurrred expenses in
founding another business of like kind, and was en-
gaged in carrying it on. The situation of the parties
had so changed that to restore the *status quo* between
them was altogether impossible. The only means, there-
fore, of repairing the consequences of the mistake, would
be to allow Branch to recover back from Cooper so
much of the price paid as had nothing to represent it
in the value of Cooper's interest, the subject-matter of
the sale.

It is said that to allow this would be to make a new
contract for the parties, especially as Cooper would not
have sold for a less price had he known of the mistake.
Undoubtedly there is much force in this suggestion, but
we think the sounder view of the law is that in all busi-
ness dealings, there is, if neither party be in *laches*, an
implied agreement to correct mutual mistakes and re-
pair their consequences when the same can be done
without injustice; and we can see no injustice whatever
to Mr. Cooper in requiring him to refund so much of
the price as resulted from the mistake and for which he
gave no value. In ascertaining the amount which he
ought to refund, he should be allowed the benefit not
only of the value of his interest as exhibited by the
books when purged of the mistake, but any additional
value which his interest really had at the time of the
sale. Though Mr. Branch made the purchase at the
book valuation, yet he should account for all he got at
its real value, not merely at the value shown by the
books after correction; for certain assets, such as the
lease of the store, etc., were not shown by the books at
all, and it would not be just to correct in his favor the
mistake without making him account for every dollar
in value which he received, whether entered on the
books or not. Thus if the true value was as found by

the jury, $7,368, rather than $5,182.60 as shown by the books purged of the error, the difference between the former sum and what he paid, to wit, $10,000, should be the measure of his recovery. So it seems to us; but whether there would be injustice under all the circumstances of the case in requiring Mr. Cooper to refund, as well as how much ought to be refunded, may well be treated as a question of fact for a jury. The rule of law on the subject seems to us to be the rule of natural justice only. There is no obstacle in the law to requiring Cooper to refund so much as in natural justice he ought to refund; and he can be required to refund that much but no more.

We distinguished this case from *Steadwell vs. Morris*, 61 *Ga.* 97, in several particulars. In that case there was no measure by the partnership books, of the interest bought and sold. There was nothing showing that the mistake was mutual, or that the party aggrieved by it was not in *laches*, and there was no attempt to repair the consequences until after the lapse of several years. Here books of the firm treated alike by both partners as correct, by mistake measured values erroneously. There is no ground for imputing a want of diligence to either. The mistake was discovered and verified within a reasonable time, and this bill for redress was filed within about six months after the verification.

3. The several questions of practice made in the record need not be specifically dealt with, as they are not likely again to arise. We have preferred to confine our examination to the substantial merits of the controversy; and what we have ruled will serve, we think, as a sufficient guide on another trial. The case should be tried over; and as it involves in so large a degree principles of natural equity, we would suggest that it be submitted to the jury in its totality, with instructions

from the court as to the law conformable to the views announced in this opinion. Should the parties or either of them not acquiesce in the suggestion, but claim the right given by code, §4206, it would be well for the court to submit as special questions of fact, with others, the two which we have·indicated, namely, whether according to natural justice anything, under all the circumstances, ought to be refunded, and if anything, how much?

Judgment reversed.