## SINGER *v.* GRAND RAPIDS MATCH COMPANY.

1. In every contract of sale the minds of the parties must meet. Where one supposes that he is buying five car-loads and the other that he is selling one car-load of matches, there is no sale.
2. An ambiguity, or a mistake by a slip of the pen or tongue, can not be caught up and used as the basis of a contract, particularly where such a mistake is known, or, from all the circumstances, should be known to the party seeking so to use it.
3. Courts can not relieve from bad contracts or hard bargains where they have been deliberately made ; but where, from mistake or otherwise, both parties have not agreed to the same thing, no contract has been made, and there is nothing to enforce.

*Argued January 27,—Decided February 7, 1903.*

Action for breach of contract.      Before Judge Calhoun.      City court of Atlanta.      May 19, 1902.

Dewald & Co., brokers in Atlanta, wrote to the defendant company, proposing to sell their matches, and asking for samples, quotations, and rate of brokerage. The defendant answered : " We have forwarded you to-day by express prepaid samples of matches in 100, 200, and 500 sizes. You will note that the 200 are exceptionally large boxes, being more than full count. We intend eventually to put these out as 300 short count. In about sixty days we will have 200's long and short, also 50 size. We can quote you as follows :

"A – 1 No. 100 — 100 matches in slide box 12 boxes in package 24 packages in case making 2 gross case, in lots of 20 gross or over 80c. per gross, less than 20 gross 90c.

"A – 1 No. 200 — 220 matches in slide box 12 boxes in package 12 packages in case making 144 boxes in 2 gross case, 1.55 per case for 20 gross or over, for less than 20 gross 1.60.

" A–1 No. 500 — 500 matches in slide box 12 boxes in package 12 packages or 144 boxes in 5 gross case, 3.75 per case for 20 gross or over, for less than 20 gross 3.85.

" In lots of 100 cases or over these prices delivered. The very best price is 10% 2 off cash, net 30 days. Special discount to jobbers of 5 and 10%. We will allow you 5% commission as selling agents. We may be able to shade these prices for car-load orders.".

Dewald & Co. then wrote to defendant : " We think that possibly you have made some mistake in your quotations, as we have read your letter over several times, and can not come to any other conclusion. You quote the A–1 100s at 80c. per gross, A–1 200s at $1.55 per cs. of 2 gross cs. or 77 1/2 c. less than 100s. A–1 500s at $3.75 per cs. of 5 gross, or 75c. per gross, 5c. less than A–1 100. Please send us new quotation, your very lowest prices in car lots, delivered here," etc. · The defendant answered : " We have made no mistake in our quotations, but the 200s we made an error in making the boxes, which contain about 220 matches. We will eventually use this size as short 300. . . We enclose you herewith new price-list . .

" A–1 No. 100 — packed 100 to 110 matches in slide box 12 boxes in pkg. 24 packages in case making 2 gross case, 20 gross or over, 80c. per gross ; less than 20 gross, 90c. per gross.

" A–1 No. 100 — packed 100 matches in slide box 12 boxes in package 5 doz. packages in 5 gross case, 20 gross or over, 75c. per gross ; less than 20 gross, 85c. per gross.

" A–1 No. 200 — 220 matches in slide box 12 boxes in package 12 packages in case making 144 boxes in 2 gross case, 20 gross or over, 1.40 per case ; less than 20 gross, 1.50 per case. ·

" A–1· No. 500 — 500 matches in slide box 12 boxes in package 12 packages or 144 boxes in 5 gross case, 20 gross or over, 3.25 per case ; less than 20 gross, 3.50 per case. . . "

Dewald & Co. then wrote to defendant : " Please ship H. L. Singer 140 cs. A 1 — 500 matches 5 gro. cs. a. $3.25 cs. 260 cs. A 1 — 200 matches 2 gro. cs. a. $1.40 cs. Less 10% & 2% cash 10 days delivered." A shipment of matches was made in response to this order. Upon their arrival in Atlanta, Singer inspected them in the car, and wrote to the defendant : " We bought from your broker, G. A. Dewald & Co., a car of matches. The 200s were to be packed 2 gro. in case, and the 500s 5 gro. in case. We bought

them at a price by the case, to contain 2 & 5 gross respectively. They are here and only contain one gross to the case. We can not use them. We sold on the same basis as bought; we spent much time on them ; and some of the trade are demanding them of us, and threaten to sue if we do not deliver. . . We are willing to take the matches at prices agreed upon, that is for a case containing 2 gro. of 200s and a case containing 5 gro. of 500s." A later letter from Singer to the defendant acknowledges receipt of one from defendant (which is not in evidence), and says : "We saw your quotations on the matches, and do not see how it could be construed otherwise than that the matches were packed 200s 2 gro. to case and 500s 5 gro. to case, and the prices named were for 2 and 5 gro. respectively. We have gone to considerable expense and devoted much time to them, and for this we shall expect you to send us check for one hundred and fifty dollars. We could have made much more out of the deal, had you filled order as sold us by your brokers." Defendant then wrote to Singer : " Please take notice that, in accepting car-load of matches [described], you will be held responsible for the following prices, and no other, to wit: 399 cases A No. 1 500 at $3.25, $1296.75 ; 562 cases A No. 1 200 at $1.40, $786.80. Take notice that the car was shipped to you upon the basis of the prices just stated, and in accepting it you will be held responsible for that price."

Singer brought suit, alleging that he had sold all of the matches he bought of defendant through Dewald & Co., to different persons in the course of trade, at a profit of $506.56, which he lost by the failure of defendant to ship and deliver the same. He excepted to the grant of a nonsuit. In his testimony appears the following: " I bought the first lot, and before they were shipped sent an order for more through the broker; and these are what came to me, this bill to me, 240 cases of A No. 1 500s and 240 cases No. 200s. . . Then there were some other matches consigned to Dewald & Co., which I also bought before the car arrived here; they were all shipped to me as consignee. . . I bought the matches 200s two gross in a case, 500s to come five gross in a case. The matches never came as they were bought. I bought them two hundred matches to the box, two gross in a case; five hundred matches in a box, five gross to the case. I bought them by the case, but you understand the cases were to contain so many gross. When they

were examined the No. 208s contained only one gross, the No. 500s contained only one gross. In response to letter their agent, Mr. Holden, came here. . . They said they had sold them to us as we had bought them. Two gross 200 and 5 gross 500 in a case. He left and sent me" the letter last quoted. "I did not receive the matches on the terms in the letter; those were not the terms on which I had bought them. After I bought them at the terms alleged, we went to work and sold them," before the car arrived. "Those matches were worth on the market what I sold them for. I had profit in those sales, $506.50. . . We sell matches of different sizes and different kinds. We have matches that come packed 10 gross in a case, some 5 gross in a case, some 3 gross in a case, and some 2 gross, and some one gross. . . When I made the trade with Dewald, I had seen the quotations on the price-list. . . I expected to pay as they were quoted. . . This is the way I bought them: two gross in a case, and five gross in a case, at so much per case. I had that understanding with Dewald & Co. They were to come two gross in a case and five gross in a case. . . When Mr. Holden came I refused to give him the bill of lading when he asked for it."

Dewald testified: "200s mean 200 matches in a box. We sold these matches by the case. We did that because they were to be packed two gross in a case. They quoted them to us at so much a case. We sold them by the case. They named five gross in a case. We sold them for five gross in a case on the quotations received from them. When the matches came, . . I found the 200s packed only one gross in a case, and the 500s packed only one gross also. That was not the way we had sold them. We sold the 200s to be two gross in a case, and sold the 500s to be five gross in a case. . . The 500s of the same match, 500 in a box, we were to get for less than the 200 in a box. We ordered 200s because the trade wanted them. The trade would rather pay 70 cents per gross for matches 200 in a box than to pay 65 cents a gross for matches of the very same kind 500 in a box. . . It seemed they preferred 200 in a box at 70 cents to 500 in a box at 65 cents. . . I do not think I ever saw 500s packed 5 gross in a case, or ever heard of it. I have heard of 200s packed two gross in a case. I have seen that. . . The Diamond Match Company packed matches exactly like these matches were packed. . . The Diamond Match

Company is a big trust, and we thought we were going outside the trust and getting them cheap. . . I never saw as cheap matches on earth as those matches."

The other testimony is of similar character to that before stated.

*Westmoreland Brothers*, for plaintiff.

*E. M. & G. F. Mitchell* and *Arnold & Arnold*, for defendant.

LAMAR, J.    This case involves matches by the car-load.    Under plaintiff's construction he bought five car-loads ; under defendant's construction it sold only one.    The difference arose from the confused and ambiguous language used in the defendant's price-list and in the letters giving quotations.    It was contended in argument here that there was no ambiguity to those engaged in the match business; but to the ordinary mind there is no doubt that, at first blush, the plaintiff's construction seems to have been natural; and if the case were to be determined on that ground, the court would have no difficulty in adjudging that the nonsuit was improperly granted.    If the plaintiff had actually received the five car-loads of matches, believing in good faith that the seller understood the contract in the same way as the buyer, and if thereafter the latter had changed his position,—had sold the goods at a price based on his understanding of the quotations, and otherwise acted upon what he thought was the mutual understanding of the parties, and if thereafter the seller had brought suit for several times the amount for which the buyer supposed he was liable, the seller would be held to his contract.    Even if the contract was ambiguous, the rule would be applied that an instrument is to be construed most strongly against the one who prepares it.    Civil Code, § 3675 (4).    But that is not this case.    The seller has not parted with the goods, and the buyer has not paid the purchase-money. It is true that he claims that he had taken orders to deliver matches out of this lot, and that he would have made a profit had the matches been delivered and thus resold.    But the loss of profits anticipated is not sufficient to prevent the application of the rule by which this case is governed.

The price of 144 boxes, each containing 100 matches, was 80 cents ; and the defendant argued from this, in connection with the other items in the price-list, that in the sale of matches the unit is a *gross*, or 144 boxes, each containing 100 matches.    Number 200,

" 220 matches in slide box, 12 boxes in package, 12 packages in case, making 144 boxes in 2 gross case, 1.40 per case." Number 500, " 500 matches in slide box, 12 boxes in package, 12 packages or 144 boxes in 5 gross case, 3.25 per case." The defendant's brokers, on these quotations, procured an order from the plaintiff for cases of number 200 and cases of number 500. If the plaintiff's construction of the quotation is correct, it would have required about five cars to contain the goods bought, and only one if the defendant is correct. As to number 200 an ambiguity may arise from the double use of the word "case." It appears that 144 boxes were to be packed in a case, and two of these cases were then to be packed in a still larger case, and it is this large case which the plaintiff says was quoted at $1.40. For the reasons hereafter to be given, we think that the real subject-matter of the quotation was the small case containing 144 boxes. Number 500 were quoted, " 12 boxes in package, 12 packages or 144 boxes in 5 gross case, 3.25 per case." It does not appear that here there was any small case in the large case; and while the defendant's contention may possibly be sustained by putting the emphasis on the word " gross," and five gross in a case, yet it must be admitted that there is much which warrants the interpretation placed thereon by the plaintiff. The language is so confused that it is really doubtful whether it means anything, if it does not mean what the plaintiff claims. But we do not think that it is so much a case of ambiguity as one of mistake; and this mistake appears more from calculation than from the language used. Bearing in mind that 144 boxes each containing 100 matches sell at 80 cents, then, if the plaintiff's contention is correct, one could buy a gross of number 500 for 75 cents. In other words, a gross of number 100, containing 14,400 matches, would cost 80 cents ; and a gross of number 500, containing five times as much, or 72,000 matches, would cost 75 cents, or five cents less. Why should any one ever buy number 100 or number 200, in view of this price of number 500 ? It is a matter of every-day experience to make a wholesale rate less than the retail rate, but unheard of for a barrel-full to be sold at less than a quart. There is nothing in the record to show any reason why matches should be an exception. The contention of the plaintiff would bring the much discussed principle of " charging less for the long haul than the short haul " into the affairs of

merchants. It was argued that the plaintiff himself showed by his letter, written when he first saw the car, that he understood he was buying by the gross; for he wrote, " We saw your quotations on the matches, and do not see how it could be construed otherwise than that the matches were packed 200s 2 gro. to case and 500s 5 gro. to case, and the prices named were for 2 and 5 gro. respectively." He says, however, that this letter shows that he was buying by the two gross and by the five gross, by the large case, and not by any part of what was in the case. If such was his construction, and if such was borne out by the quotation, we think the record clearly shows that such was not the intent on the part of the seller. The seller shipped only one car-load, and invoiced it at the prices based on its theory of the sale being by the small case, or by the gross ; and is sustained by the absurd results which would follow from adopting the plaintiff's theory. It brings itself within the rule as to mistake, by which it is relieved from the position in which its unfortunate use of the English language has placed it.

The requirement of Civil Code, § 3526, that there must be an identification of the thing sold and an agreement as to the price, is but an expression of the general rule of law, and another way of saying that the minds of the parties must meet, both as to the price and as to the thing bargained for, —which may include an identification of the quantity sold. The evidence here clearly indicates that the minds of the buyer and the seller did not meet. The difference in the quantity is so great, and the result, if plaintiff's contention is sustained, would work such a manifest hardship on the seller, and such an undue advantage to the buyer, that damages will not be allowed for the breach of such an alleged contract. It is true this is a case at law, but the rule in equity would help to illustrate the question. Where as the result of a mistake, with knowledge thereof by one of the parties, a contract of sale has been executed, a court of equity will grant relief. *Werner* v. *Rawson,* 89 *Ga.* 619. Relief was granted in *Cooper* v. *Branch,* 82 *Ga.* 512, where the mistake was unknown to both parties, and neither was in laches, it being possible to make the correction without injustice to either. In *Webster* v. *Cecil,* 30 Beav. 62, it appeared that the vendor (the defendant) had offered to sell certain property to the plaintiff for £1,250. This offer was accepted. The vendor had,

by mistake, inserted £1,250 instead of £2,250 in his letter, but immediately gave notice of the error, and the court refused to decree specific performance, saying that it would not compel a person to sell property for much less than its real value, and for £1,000 less than he intended. In Harris v. Pepperell, 5 L. R. Eq. Cas. 1, the court held that the rule that equity will not interfere to rectify an instrument unless it be proved that the mistake was common to both parties does not apply to a contract of sale when it is in the power of the court to put the parties "in their original position." Here the title did not pass, no money was paid, and the parties can be left where they are without damage to either. The plaintiff is asking for an enforcement of a contract to which the mind of the opposite party has never assented, and to which, under the evidence, the plaintiff must have known the defendant did not intend to assent. It is much like the case of Greene v. Bateman, 2 Wood & M. (C. C. U. S.) 359, where shingles were sold and delivered at $3.25, but there was a dispute as to whether $3.25 was for a bunch or for a thousand. The vendee offered to return the shingles or to pay for them by the thousand, but the vendor refused to receive them and insisted on payment at $3.25 a bunch. In consequence of the refusal to retake them or receive them the vendee retained possession and subsequently sold them; and upon being sued for the value at what the vendor claimed was the contract price, the court ruled that the defendant was only liable for the price actually received for the shingles; that had the vendee set them apart and given notice that he would not keep them, he would not have been made liable for the shingles, for the reason that both parties had not understandingly assented to the same contract. So in Harran v. Foley, 62 Wis. 584, 22 N. W. 837, where a party by a mistake offered property at a lower price than he intended, it was held: " Where the blunder made by the person is obvious, an acceptor will not be permitted, by catching it up, to take an unfair advantage." Civil Code, §§ 3535, 3660, 3982, 3983 ; 88 *Ga.* 748.

But the plaintiff insists that the broker wrote to the defendants inquiring as to whether they had not made a mistake in the quotations, and received a reply that the quotations were correct. This was true. The quotations were correct. The mistake arose from the construction placed thereon by the defendant differing so radically from that of the plaintiff. Under the limitations previously stated,

the defendant will not be visited with a penalty because of the misconstruction thereof by the opposite party. A slip of the pen or a slip of the tongue ought not to be treated as a deliberate contract, unless the other party has acted thereon to his injury. There is nothing in the principle recognized by any of the authorities cited which in any way tends to relieve parties from their contracts or to let them out of hard bargains. When such contracts have been made, the courts are called on to enforce them. But the question in this and similar cases is, has there been a contract made? Did the minds of the parties meet? Where there has been no fraud, deceit, or mistake, where the terms of the contract are clear and unambiguous, neither party can escape liability by the mere statement that he made a mistake. But if by reason of ambiguity in the terms of the contract, or some peculiar circumstances attending the transaction, it appears that one of the parties has, without gross fault or laches on his part, made a mistake, that this mistake was known or ought to have been known to the opposite party, and that the mistake can be relieved against without injustice, the court will afford relief, either by refusing to decree specific performance, by cancellation, or by refusing to give damages. There is no disposition in the law to let one "snap up" another or take an advantage of mistakes. In many instances, where one of the parties has made a mistake, neither a court of equity nor of law will refuse to enforce the contract. Civil Code, §§ 3978, 3984, 3985, 3535. But where the mistake is patent, where the opposite party knew or should have known of it, no contract has been made, the minds of the parties have not met, and they will be left where the mistake places them.

The court did not err in granting the nonsuit.

*Judgment affirmed. By five Justices.*