## CENTRAL OF GEORGIA RAILWAY COMPANY v. GORTATOWSKY.

1. A presiding judge of a trial court should not direct the jury to find a verdict in favor of one party against the other, except where there is no conflict in the evidence, and that introduced, with all reasonable deductions or inferences therefrom, demands a particular verdict. Where there is conflict in the evidence on material issues, it is error to direct a verdict.

2. In order to make a contract there must be an agreement of parties. If there is a proposition but it is not accepted, no binding contract results.

3. If shippers applied to a railroad agent for a rate for the transportation of certain men and horses, and the agent (who was a "commercial agent" whose duty was to solicit business), not having authority to make a special rate, telegraphed to the general agent for the purpose of obtaining one, and the general agent replied through the telegraph office of the road, stating a rate, but by an error in transmission the telegram, as delivered to the agent dealing with the shipper, stated an amount lower than the general agent had written in the original telegram; and if upon receipt of such telegram the agent correctly quoted the rate as stated in it to the shippers, and if they accepted such offered rate in good faith, and the mistake was not evident, and they did not have knowledge of it, this created a binding contract upon the company.

4. If the mistake was evident on its face or known to the shippers, they could not seize upon it to take an unfair advantage of the other party.

5. If a contract is made, one party to it can not rescind it by merely giving notice to the other of his intention to do so, without the agreement or assent of such other; but it may be rescinded with the assent of both parties.

6. This case should have been submitted to the jury, and it was error to direct a verdict.

Argued May 22, — Decided June 16, 1905.

Complaint. Before Judge Spence. Dougherty superior court. October 4, 1904.

A. C. Gortatowsky et al. brought suit against the Central of Georgia Railway Company for the sum of $552. On the trial the evidence showed, without conflict, the following facts:, I. C. Brinson was the commercial agent of the defendant at Albany. His duties were to solicit business. He did not have authority to make contracts for special rates on its behalf, and this was known to the plaintiffs. At their instance he telegraphed to J. C. Haile, the general passenger agent at Savannah, who had authority to make special rates for the road, for such a rate for the transportation of troops from Lytle to Albany and return. Haile wrote, and delivered to the railroad telegraph office in Savannah, a telegram dated November 30, 1903, directed to Brinson, the

body of which was as follows: "Chairman has announced rate six dollars each direction movement troop Seventh Cavalry Albany Lytle return account street fair for men, rate on horses fifty dollars per car special service. Quote this rate to committee endeavor secure deposit for movement our line advising." In transmission a mistake was made in this message by the omission of the word "direction," thus making the message read, "six dollars each," instead of "six dollars each direction." Brinson quoted this rate to Gortatowsky on Tuesday, December 1, 1903, about noon. On the same day plaintiffs wrote to Haile a letter, the material parts of which are as follows: "We would appreciate it if you would allow us to pay one half of this transportation now, balance due carnival week; inasmuch as the subscription given by the merchants, only one half is payable now, balance during carnival. Unless absolutely necessary, we would not care to advance the entire amount now, as our advertising expense is very heavy. You will kindly advise Mr. Brinson if this is perfectly satisfactory." On the next day Haile replied in a letter which contained the following: "We would like very much to accommodate you in the matter of payment, but it is not within our power to deviate from our usual custom with respect to collecting prepaid transportation; therefore we are powerless to do anything except to instruct our representative to collect the full amount sufficient to cover the movement, Lytle to Albany, which is $510.00 provided coaches are used; if sleepers are used, $570.00." Brinson later received a copy of the letter written to the plaintiffs, telegraphed to Haile, and learned of the mistake on Thursday. He notified plaintiffs of it. The troops were carried to Albany, plaintiffs paying the amount of $552. Afterwards they were transported back to Lytle, and plaintiffs again paid $552 under protest, and it is for this that suit is brought. The difference between $570 and $552 was due to the fact that not as many men were carried as at first it was thought would be transported.

As to other matters in connection with the transaction, it is necessary to briefly set out the testimony of each side respectively. One of the plaintiffs testified as follows: The rate was quoted to them on Monday or Tuesday. They accepted it in good faith. There was nothing in the rate quoted to put them on

notice that it was wrong. Brinson did not say that the rate was any lower than it had been, and the rate quoted to plaintiffs was that which they expected to pay, and which they told Brinson would be the usual rate. Brinson told the plaintiffs that Haile had telegraphed him, and was expecting him to secure "the movement;" and plaintiffs said to him that they expected to pay about six hundred dollars, and to get the rate and he would get the business. He told them that he would have to get the rate from Haile. Brinson went to one of the plaintiffs on the night of December 3, and told him that the rate which he (Brinson) had quoted was a mistake, and that the amount named would be for each way. When Brinson first quoted the rate the witness told him that it was a contract, that they would take the rate and to go ahead, that it was his "movement." The plaintiffs afterwards wrote a letter to Haile asking him to let them pay one half of the freight at that time. But the rate was accepted without any condition. Prior to these negotiations plaintiffs had spent $20 in advertising this attraction for the carnival. Brinson telegraphed to Haile, on the 30th of November or the first of December, that he had secured "the movement." A check for $570 was given to Brinson. The difference between this and $552 was refunded, or the amount corrected. The check bore date December 2, and on it were the words, " movement troop C." In regard to this payment the witness testified as follows: "We paid the money to him the latter part of the week some time. When we paid Mr. Brinson that money we understood that there had been a mistake; but I will tell you why we paid the money. When Mr. Brinson sent the telegram, that was right after he received the telegram, and he said, 'I have wired Mr. Haile that I have received that money, and when he wires me to dispose of it I will come over and get a check for it,' and it was there subject to Mr. Brinson's call; when we paid that money we understood that it was for the payment of the troops one way. We lost a good deal of money on the carnival, and this attraction did not prove as much as we thought it would; I don't know that I knew until after the carnival was over that we had lost a good deal of money, because one or two days of a carnival can pick up things wonderfully. It is not true that I did not make any complaint about this matter until I

found out how much we had lost on the carnival. I notified Mr. Brinson the night of the third, when he came to the opera house and told me that he had gotten instructions from Mr. Haile that there was a mistake in that telegram, and we told him that we were going to hold them to it, and he said, ' I know I never made a mistake about it.' " After the troops were brought to Albany, plaintiffs demanded that the defendant should return them without additional compensation; which it refused to do. Another witness for the plaintiffs testified, that he was present when Brinson spoke to one of the plaintiffs about the mistake in the rate quoted; that the plaintiff stated that that was wrong, and Brinson replied, " Yes I think it is a mistake, and I so wired Mr. Haile," and that the plaintiff said, " I want you to understand that I expect to hold the railroad to this rate." This witness appears to have been an agent for the plaintiffs. He further stated, " Mr. Brinson sent me a receipt by a boy, and I took it, as I didn't know what it was. He brought it to me in an envelope. I sent the check to him, and told the boy not to accept any receipt." Another of the plaintiffs testified, that the rate quoted was accepted in good faith, because he knew that the defendant had made four "movements" of this cavalry at a cent a mile; that he had investigated it beforehand to find out what it would cost them.

Brinson testified, among other things, as follows: " Plaintiffs made no agreement with me relative to the movement of troop C, other than that if my rate were as low as they could get over other lines that they would give me the movement. . . When I quoted that rate to Mr. Gortatowsky I do not remember what he said; but he gave me to understand that he liked that rate, and that it was lower than he really expected. There was no written contract entered into at the time; there was no oral acceptance of it—he simply said that it was better than he expected. I didn't have any intention of making a contract at the time I quoted the rate. . . I notified Mr. Gortatowsky of the mistake, between nine and ten o'clock Thursday night, and they said it must be wrong, and that I had better take the matter up with Mr. Haile. They had not paid me any money at that time." No money had been expended by plaintiffs except for advertising, which was done before the rate was quoted. Plaintiffs paid Brinson the money on Friday afternoon, and he

gave a receipt stating that it was for the movement of troop C, Lytle to Albany, " and it was understood then that that was for one way." He afterwards said that he made this statement " because my former rate had been withdrawn." The troop left Lytle at ten o'clock Saturday night, and arrived in Albany about three o'clock Sunday afternoon. " I received my first real complaint about it about Thursday of the following week during the carnival, forty-eight hours before the troop left. The attendance of the carnival had not been good, and both of the Gortatowsky brothers stated to me that they were losing money. The rate that was first quoted was 'exceedingly low, being less than one cent a mile for the round trip, 'the mileage being, if I remember correctly, 353 miles; and I stated to Gortatowsky on my first trip that it was an exceedingly low rate, and he stated that it was a very low rate because it was less than a cent a mile. . . I don't know that that rate was accepted by Gortatowsky brothers. He had already stated that he would give me the business, and when I quoted the rate he stated to me that it was very low and satisfactory, and I understood that the movement was mine before I quoted the rate — that is, that the movement was mine provided I could quote a rate as low as any of the other roads, and as to whether they accepted the rate when I quoted it is the question. He never used the word that he would accept the rate; he said that he was very glad to get the rate. I had telegraphed and written Mr. Haile that I would secure the movement, before I had quoted the rate. . . On Thursday I received this telegram from Mr. Haile, showing that this mistake had been made. It is not true that at that time the Messrs. Gortatowsky told me that they would expect me to protect that rate quoted them by mistake. I showed him that telegram in the opera house at the time, and if he said that I didn't hear it, and I wasn't put on any notice at that time that we would be held responsible for that rate. . . Gortatowsky brothers made no direct statement to the effect that they would release us from the rate already quoted." At the conclusion of the evidence the court refused to direct a verdict for the defendant, but directed one for the plaintiffs. Defendant excepted.

*Wooten & Hofmayer*, for plaintiff in error.
*Crosland & Jones*, contra.

LUMPKIN, J. (After stating the foregoing facts.) The court may direct the jury to find for the party entitled thereto, where there is no conflict in the evidence, and where that introduced, with all reasonable deductions and inferences therefrom, demands a particular verdict. Civil Code, § 5331. Unless this state of facts exists, a verdict should not be directed, but the jury should be left to pass on the issues. In this case there were two leading questions: Did the parties ever arrive at a valid, binding contract; and, if so, was there a rescission or release from the original terms by mutual consent or agreement? The first question may be divided into two subordinate parts: First, when the telegraphing agent made a mistake in transmission, and Brinson correctly offered to the plaintiffs the rate as received by him, considering what had transpired previously and also at that time, did the plaintiffs accept this rate and make a contract whereby they agreed to have the troops transported over the defendant's road and the defendant agreed to so transport them? Second, if there was such an acceptance by the plaintiffs in good faith and without notice of any mistake, was it binding on the company, or was the defendant relieved by reason of the mistake in the transmission of its message? The first of these last-mentioned questions is one of fact; the second, one of law. On the subject of acceptance, the evidence for the plaintiffs was to the effect that when Brinson quoted the proposed rate to them they accepted it. Nevertheless they wrote to Haile, asking him to agree for them to pay one half of the amount in cash and the balance later; and though he declined this, they succeeded in getting Brinson to treat the matter as if they had made some deposit, when in fact they had made none until after they were notified of the mistake. It is true that Haile's telegram to Brinson says, "Endeavor secure deposit," etc. But his letter to plaintiffs, dated December 2, required prepayment. The first check which was given to Brinson bore date on its face December 2, though in fact it appears not to have been given until Friday, December 4. Brinson denied flatly, in one part of his testimony, that the rate quoted by him was accepted, or that he understood that a contract was then made; while elsewhere he said that the plaintiffs had told him they would give him "the movement" if he could quote as low a rate as others, and that when he did inform them of Haile's tele-

gram naming the rate they expressed themselves pleased with it. His testimony, considered in connection with the letters above referred to, makes it by no means absolutely certain that any contract was consummated, so as to authorize the direction of a verdict. If his statement be correct, that the plaintiffs merely said that the rate was low, or was satisfactory, or the like, did the plaintiffs, in the light of all the evidence, bind themselves to make the shipment at that rate? Whether or not there was an acceptance and a completion of a contract should have been left to the jury. If the rate stated in the telegram received by Brinson was correctly communicated by him to the plaintiffs, and they accepted it and closed the contract at that rate, and were not in a position where they knew or ought to have known of the mistake, would the railroad company be bound by the contract, or would it be relieved by reason of the mistake made in the transmission of the message of its general agent? Two opposing views on this subject are entertained by the courts, which are respectively very well stated in the opinion of the majority, and in the dissenting opinion of Clark, J., in the case of Borden *v.* Richmond & D. R. Co., 113 N. C. 570. The views of the majority of the court are expressed in the headnotes of that case as follows: " 1. Where there has been no misrepresentation, and where there is no ambiguity in the terms of the contract, a party to it can not be allowed to evade the performance of it by the simple statement that he has made a mistake. If, however, a proposal by one evidently contains a mistake, the other can not, by snapping at it, be permitted to take advantage of the error. 2. Where a local freight agent of a defendant railroad company made a written order to ship cotton between two points at 69 1/2 cents per hundred for plaintiff, who at once, and in writing, accepted the offer, and it was conceded that the said local agent was authorized to make such proposal on the part of the defendant, and the agent plainly and unequivocally expressed what he understood to be the price to be charged for carrying cotton, and there was no misunderstanding between the plaintiff and the agent as to any of the terms of the alleged contract; and it appears that, by an error in the transmission of a telegram from the general freight agent to the local agent, '89 1/2' was changed to '69 1/2': Held, (1) that the contract was binding on defend-

ant company, notwithstanding the mistake; (2) that in an action by the shipper (who had paid the larger rate under protest) to recover the difference between the two rates, all evidence in regard to plaintiff's purchase of cotton was irrelevant, and plaintiff was entitled to recover." But in the case of Hartford R. Co. *v.* Jackson, 24 Conn. 514, a rate was named by an agent of a railroad, who understood the shipper to say that there were one hundred bundles of laths, when in fact the latter said five hundred bundles. It was held that the railroad company was not bound. In Gulf C. & S. F. Ry. Co. *v.* Dawson (Texas Civ. App.), 24 S. W. 566, where a shipper informed the agent of a railway company of the character of the fruit shipped, but the latter misunderstood him and quoted a rate under a mistake as to the character of the shipment, it was held that the parties did not assent to the same thing at the same time, so as to constitute a binding contract. See also Rowland *v.* New York etc. R. Co., 61 Conn. 103, 23 Atl. 755.

This court has held, that in the transmission of a telegraphic message the telegraph company is the agent of the sender; and that if an offer is made by telegram, and, as delivered to the addressee, is materially different from the telegram delivered for transmission, and is accepted, the sender is bound by the terms of the proposal as contained in the telegram delivered to the addressee. *Western Union Tel. Co.* v. *Flint River Lumber Co.*, 114 *Ga.* 576; *Brooke* v. *Western Union Tel. Co.*, 119 *Ga.* 694. These decisions are based on the ground that the telegraph company is the agent of the sender in transmitting the message. If this be true of an independent company to whom a message is delivered for transmission, we can perceive no reason why the case would be different if the telegraphing were done by a company or operators under the control of the railroad, in transmitting a message to an agent who dealt directly with the plaintiffs. The evidence states that the telegram sent by Haile to Brinson was filed "in the railroad telegraph office" in Savannah, which we understand to mean a telegraph office under control of the railroad company. There is no doubt, as Mr. Justice Cobb points out in the *Flint River Lumber Company* case, that if the status of a telegraph company is to be considered from the standpoint of agency, some very strong reasoning car be adduced to sustain the

position that the minds of the parties never met, and that there was in fact no binding contract; and also that this falls within the rule that a special agent who is directed to communicate a particular message or do a particular thing has no authority to deliver another message or do some other thing so as to make a binding contract for his principal.  Civil Code, § 3023.  But we think that the telegraph cases above referred to in principle bear strongly on this point. ·' And we must take position with the majority of the Supreme Court of North Carolina in the Borden case.  If, however, the plaintiffs had known, or from all the circumstances should have known, that the rate quoted to them was a mistake, they could not have seized upon an evident mistake to take an unfair advantage of the other party.  *Shelton* v. *Ellis*, 70 *Ga.* 297; *Singer* v. *Grand Rapids Match Co.*, 117 *Ga.* 86.  Courts can not relieve from bad contracts or hard bargains, where they have been deliberately made, and where there has been no fraud or deceit, and the terms of the contract are clear and unambiguous.  If a man puts a low price upon his property and it is accepted, he can not escape from the contract on the ground that he ought to have charged more.  This is not the character of mistake which furnishes a ground for relief in equity. *Alexander* v. *Herring*, 54 *Ga.* 200.  Nor does mere ignorance of a fact by both parties do so.  Civil Code, § 3985.  Nevertheless the law of, this State does recognize a difference between reforming a contract, and executing a contract in case of a mistake. To authorize a reformation of a contract on the ground of mistake, such mistake must be mutual; but the courts may decline to enforce the execution of a contract, if the mistake is confined to the party refusing, provided it is such a mistake as furnishes a good defense, and it can be corrected without injustice to the other party, and. the party seeking the rescission or asserting the mistake has not been guilty of such negligence or laches as to prevent his doing so.  On the subject of mistake as furnishing a basis for defense, or for equitable relief, see Civil Code, §§ 3535, 3660, 3981, 3982, 3983, 3984, 3985, 3974; *Stix* v. *Roulston*, 88 *Ga.* 743; *Singer* v. *Grand Rapids Match Co.*, 117 *Ga.* 86, supra; *Werner* v. *Rawson*, 89 *Ga.* 619; *Jossey* v. *R. Co.*, 109 *Ga.* 439, 447 (discussing the *Werner* case and section 3974 of the Civil Code); *Keeth* v. *Brewster*, 114 *Ga.* 176; *Atlanta Trust* &

*Banking Co.* v. *Nelms*, 116 *Ga.* 915, 923; *Comer* v. *Grannis*, 75 *Ga.* 277 (in which case rescission of an executed contract was denied); *DuBignon* v. *Mayor*, 106 *Ga.* 317; *Dyer* v. *Walton*, 79 *Ga.* 466.

If a binding contract was entered into between the plaintiff and the defendant, the latter could not rescind without the assent of the former.   One party to a contract can not rescind it by mere notice to the other.   *Oklahoma Vinegar Co.* v. *Carter*, 116 *Ga.* 140.   But rescission may be had by mutual consent. There was no express statement that the original contract should be rescinded or changed; but the evidence was conflicting as to what transpired and as to the conduct of the parties.   If there was a valid, binding contract, but the parties consented to a correction so as to make it conform to the telegram sent, whether this would amount to a technical novation, with the requisites thereof, does not require decision at this time.   The issues as to whether or not there was an acceptance and the making of a contract, and whether or not there was an assent to a rescission or change from the rate first quoted, were made by the plea.   The question whether there was knowledge of the mistake on the part of the plaintiffs and an effort to seize on the mistake to take an unfair advantage was suggested in the briefs, but was not made in the plea filed.

*Judgment reversed.   All the Justices concur, except Simmons, C. J., absent.*