THOMAS *v.* THE STATE.

ATKINSON, J.—1. Where upon the trial of a criminal case it appears that for some time previous to the trial the defendant had been confined in jail, that in due season he requested the sheriff to subpœna a witness in his behalf who resided in the county, and thereafter several times reminded the sheriff of his request, the latter promising to comply therewith; and where it further appears that the facts to which the alleged witness would if present swear were not only material but of vital consequence to the defense; and the showing being in all other respects in perfect conformity with the requirements of the law, it is no reply to a motion to continue upon such a showing because of the absence of such witness, that on the night immediately preceding the trial the sheriff had sent a bailiff to subpœna the witness, who going to the house of the witness was unable to find him or to ascertain his whereabouts; and the refusal to grant a continuance was error.

2. Where a motion for a new trial is made during the term and an order taken to perfect it in vacation, the court, as to that case, in contemplation of law continues in session until the time limited in the order, and a party moving for a new trial may as a matter of right, under section 3503 of the code, amend his motion at the hearing by the insertion of new and independent grounds of error; and this right is not subject to any arbitrary limitation imposed either by the practice prevailing in any particular judicial circuit or by the order of the judge in granting a rule *nisi.* Motions for new trial must be made during the term (unless upon extraordinary grounds), but for proper reasons the presiding judge may grant such reasonable time thereafter for the preparation of the grounds and brief of evidence as the justice of the case may seem to require; and where such time is granted, the judge may not arbitrarily refuse to allow amendments to the grounds of the motion because, according to the practice prevailing in that circuit, certain classes of exceptions to rulings of the presiding judge are required to be submitted during the term. In all such cases, however, the movant must abide the consequences of the judge's inability to remember with such accuracy the minor happenings upon the trial as will enable him to certify the grounds as true. If he remembers, he should allow the amendment; if he does not, he should refuse to certify its truth. In this case it does not appear that the presiding judge did not remember; and he therefore erred in rejecting the amendment offered.

3. The office of a charge by the court is to give to the jury such instruction touching the rules of law pertinent to the issues involved in the pending trial, as will enable them intelligently to apply

thereto the evidence submitted, and from the two constituents law and fact make a verdict. In delivering his charge the trial judge should carefully avoid an invasion of the province of the jury. He should refer to the evidence only so far as is necessary to present the leading issues in the cause, leaving the minor contentions of opposing counsel to the consideration of the jury under appropriate general instructions. It should contain no such summary of the evidence as might to a jury either seem to be an argument or amount to the expression or intimation of an opinion thereon. It is, therefore, error: 1st. For the presiding judge to repeat the substance of the testimony of the State's witnesses as detailed from the stand, and submit this with the argumentative deductions drawn therefrom by the State's counsel, as the issues in the case. 2d. It is likewise error, where the evidence shows only that the defendant and deceased went off together, to charge that if the defendant "took charge" of the deceased, he should account for him. 3d. It is likewise error to use such language, in instructing the jury upon the subject of the impeachment of a witness, as to suggest to their minds that because of his ignorance or inexperience he had been overreached or entrapped by counsel in the cross-examination; such a matter being one exclusively for the jury and appropriate to be dealt with by argument of counsel rather than by the charge of the court.

4. Where the presiding judge by his general charge presents to the jury the law governing the substantial and controlling issues in a case, the mere failure or omission to charge upon minor points, to which his attention is not called at the time, is not ground for a new trial.                                        *Judgment reversed.*

February 5, 1895.

Indictment for murder. Before Judge BOWER. Worth superior court. October term, 1894.

There were two counts in the indictment against Thomas: one charging him, as principal, with the murder of Tom Watts; the other, as being accessory before the fact to the murder of Watts by Nim Kerce and Cliff Kerce. He was found guilty of being accessory before the fact, with the recommendation that he be imprisoned in the penitentiary for life. His motion for a new trial was overruled, and he excepted.

1. One of the grounds of the motion was, that the court erred in refusing a continuance. As a showing for continuance, defendant testified: I have an absent

witness named Tom Wiley. He is not absent by my leave or consent, and I expect to have him here by the next term of the court. He lives in this county. I am not making this motion for delay, but in order to get his testimony. I expect to prove by him, that Tom Watts was seen by him, the morning after the time Hiram Warren said he went off with me, and that he was cutting potato vines to set out potatoes; that Tom Watts was alive and helped me cut potato vines the morning after Warren swears he went off with me, and was not seen afterwards. Tom Wiley lived with his mother, and came by there that morning. The road ran right by the potato patch. Mr. Wiley will swear that he saw Watts the morning after the night Warren swears he saw him go off with me. I am positive he will swear that. I tried to get him here last court. I told the sheriff last Monday a week ago to send out subpœnas for him. Last Monday the sheriff told me to make out a list and give it to him, and I told him I could not write, and he asked could none of the boys write, and I said "No," and he said he would attend to it in the morning if I could make him think of it; and Tuesday morning I mentioned it to him again, and he told me he had to go off but would be back after breakfast, and he came back and I mentioned it to him again. I was in jail all the time. I mentioned it to him last Monday a week ago, and every day since.—In resistance to this motion for continuance, the State introduced one Kemp who testified: I had a subpœna for Wiley; went to his house and he was not there, that is I could not raise anybody; and I went up to Mr. Watson's and called, and they said he was not there, and they asked what I wanted, and I said I had a subpœna for him, and they said his wife was there, and I asked her where he was, and she said, she could not tell where he was, that he went off that morning, that he might be at Mr. Kerce's, but she did

not know whether I could find him there or not.   I did
not go to Kerce's to hunt him.   That was last night be-
tween ten and eleven o'clock, and if Wiley was at home
at all he lay mighty close.   My instruction from the
sheriff was to go and summon him.   I did not go to
Kerce's, because his wife said she did not know whether
he was there; she did not say he had gone there, but that
he might be there.   When I found Wiley's house it was
about ten or eleven o'clock last night.   I asked Mr.
Kerce first where Wiley was, and he said he was at home.
It is nothing unusual for a man to be away from home.

2. The grounds of the original motion for new trial
were, that the verdict was contrary to the evidence and
without evidence to sustain it.   This motion was filed
during the term at which the case was tried, and during
that term the court passed an order reciting, that the
court was about ready to adjourn, and the stenographer
not having had time during the term to write out the
evidence and charge of the court, so that the defend-
ant's counsel could prepare a motion for new trial, it was
by consent ordered that defendant's counsel have until
November 25, 1894, to prepare a brief of the evidence
and present the same to the court for approval, and to
amend his motion for new trial as to any exception to
the charge of the court and the motion to continue, and
that said motion be set for trial on said date in Novem-
ber, but might be reset by the judge without prejudice
to either side.   One ground of the amended motion
was, that the court erred in this:   When the jury first
came in and delivered their verdict it read: "We, the
jury, find the defendant guilty as accessory before the
fact, and recommend him to the mercy of the court."
The judge then asked them if they meant by that to put
him in the penitentiary for life.   The foreman replied,
that they wanted the court to put a less punishment
than that on him.   The court then erred in telling the

jury: "Gentlemen, if you wish to put the defendant in the penitentiary for life, you must so write on your verdict, or the penalty will be death." Defendant insists that this was error.—This ground was corrected, by stating that the court charged the jury fully and explicitly on the subject of the punishment, that the punishment would be death unless they recommended that the defendant be punished by imprisonment in the penitentiary for life, in case they found him guilty; and then sent the jury back to their room to make up their verdict. As to this ground the court certified, that it was disapproved as incorrect, and after being corrected by the court was stricken, because the amendment by this ground came too late according to the order above mentioned, which limited the amendment to only such grounds as the motion for continuance and exceptions to the charge of the court; the court having stated to counsel for defendant, that all other grounds must be made before the adjournment of the court, while they were fresh in the mind of the court, according to the practice in that circuit. Defendant excepted to the refusal to approve this ground and to allow it as an amendment to the motion.

3. The following parts of the charge were excepted to: "The State insists that the defendant and Nim Kerce made a plot near the gate that leads into the lane that leads to the lot of Albert Kerce, in which they agreed to kill Tom Watts; that Nim Kerce first made the proposition, 'Let us kill Tom Watts'; and that the defendant agreed to it, and then asked, 'How will we get him off?' and that defendant proposed that they would make out to Tom Watts that there would be preaching at Judge Heygood's that night, and that he would get him off that way, and Nim told him to go and get Tom as soon as he finished his supper and bring him down to his (Charley's) house, where Nim would go, and Nim went

off then towards the defendant's house, Charley Thomas' house, and Charley Thomas went towards Albert Kerce's house where Tom Watts was eating supper, and met him between the yard gate and the house, Tom having finished his supper, and took him off with him, going towards the defendant's house, and that was the last that was ever seen of Tom Watts until he was found murdered out there by the round pond.

"The State insists from that, that this defendant having taken charge of Tom Watts under that plot for the purpose of killing him, for the purpose of pretending to carry him to church at Judge Heygood's, under a plot to kill him at the round pond which was on the way from Albert Kerce's to Judge Heygood's, having taken charge of him, and Tom Watts having been found dead out there, apparently having been killed some time, and not having been seen after that night and after the defendant took charge of him, that it would devolve upon the defendant to account for him if he did not kill him after he took him in his charge; that that would be sufficient circumstances to warrant a verdict of guilty against him; that it would be the duty of the defendant to account for him if that evidence is true, of his making the plot, and taking charge and starting off with him and Tom never being seen any more until found dead where they said he would be murdered at.

"I charge you, if you believe that testimony, you would be authorized, if you saw proper, to find a verdict of guilty against the defendant on these circumstances and the evidence of that plot, either as principal or as accessory, according to the testimony. It would have devolved upon the defendant, if he did indeed make a plot with another to kill Tom Watts on the way to Judge Heygood's, at the round pond that night, and a part of the plot was that he was to take charge of him and carry him down to his house, and

finally carry him on a pretended mission to church by the round pond for the purpose of getting him out there to be killed; if that was the plot, and you believe he took charge of him for that purpose, it would devolve on him to show what he did with Tom Watts; and if he did not show what he did with him, you would be authorized, if you saw proper and believed him guilty beyond a reasonable doubt on that testimony, you would be authorized to find a verdict of guilty against him, either for murder, as principal in the first degree, or as accessory before the fact, according to the whole testimony in the case.

"The State insists, further, that the defendant has not given any account of his own whereabouts, except what he gave in his statement on the trial before, which the State introduced itself. In his statement on the present trial, I believe, no account was given of his whereabouts that night at all. I do not remember positively, but you can look to the testimony; but the State saw proper to introduce his statement made on the previous trial where he does give an account of where he was. The State therefore insists that he gave no account of himself except his own statement made in his own behalf on his trial for murder.

"Now, there are many rules by which you would be governed in determining whether the evidence is true or not. You would, of course, have to call upon your human experience to perhaps a great extent, and to your knowledge of human nature and mankind, so as to look at the evidence from every view and every standpoint, and give the evidence a fair consideration, not an unfair consideration; give that witness's [Hiram Warren's] evidence a fair consideration so as to see whether it is true or not. In doing so, you would have the right to consider who that witness is; you would have the right to consider whether he is an expert, that is, a

shrewd, sharp witness versed in law, acquainted with courts, acquainted with all the intricacies of law questions, whether he knows the difference between what the effect of his testimony would be in one way and in another way, whether he is so learned and educated and skilled in the law that he would know of those differences and variations that might be given to testimony like a shrewd lawyer would; or whether he be a man of common intellect, an ordinary, plain man, uneducated, unacquainted with courts, unaccustomed to testifying, not accustomed to testifying from the stand, whether he be educated or not; judge of this from the character of the testimony, the manner he gives in his testimony on the stand, whether he is a plain, ignorant, unsophisticated man, or whether he is a sharp, shrewd, expert witness or not; and deal with his evidence according to what you might see that he was.

"And also consider what seems from the testimony in the case to be the strength of his mind, or the strength of his memory, or the acuteness of his mind to lay stress or emphasis on any particular part of the testimony, or to be watchful or not watchful about his statements when asked questions by the lawyers; whether he is a witness that would be very watchful to see whether he did not contradict himself, or whether he would not be watchful; whether he is a witness that would be very particular about minor points, or whether he is a witness that might naturally be not very particular about minor points, not be watchful of his statements as to minor points; how easy or how hard it would be to entrap him or to confuse him or to throw him off his guard or his balance; whether he is a witness so shrewd and expert and skilled that you could not throw him off his guard at all, could not make him make contradictory statements; or whether he is a witness so plain and so unsophisticated and so uneducated, and so un-

skilled and unaccustomed to courts and law and lawyers
that he could be thrown off his balance and made to con-
tradict himself.    Look to all that, as reasonable, intelli-
gent, honest, fair-minded men, so as to determine whether
this witness has spoken the truth or has wilfully lied.

"It is contended by the defendant, that he [Warren]
has made many contradictory statements in his testi-
mony on the stand during this trial; that he said at one
time that he had finished feeding the hogs before he
heard this conversation, and said at another time that
he was feeding the hogs, or something of that nature or
character.    Look to it, and see from the nature of that
evidence the character of that witness; whether he
would have been apt to have been watchful as to his par-
ticular sayings on that particular point, whether he
meant that he went out there to feed the hogs, or
whether he meant that he was feeding the hogs at the
very time of the conversation.

"I charge you further, that in criticising the testi-
mony of a witness, the witness has a right to explain
himself.    If the witness states he was out there feed-
ing hogs when he heard the conversation, and another
time he states he had finished feeding the hogs and
started back to the house when he heard it, and the lawyer
says, 'How do you make such contradictory statements as
that?' he has a right to explain; and if he explains that
what he meant was, that he went out there to feed hogs,
that that was the way he was out there, and after he
fed the hogs he started back and heard the conversation,
you can take that explanation and consider it with the
witness's evidence, and determine whether he wilfully
lied or merely had not been very watchful in regard to
his statements; whether he was a man that was used to
being watchful or not in regard to his statements.    So
it would be in regard to any other statement of that
character.

"If the witness stated at one time that they were standing at the lot gate when the conversation occurred, and stated at another time that they were standing at the lane gate; if he then is assailed on the ground that he has made a contradictory statement; if he stated at one time that the conversation took place at the lot gate, and another time that it took place at the lane gate, he has the right to explain; and if he explains that what he meant by saying they were standing at the lot gate was, that they were standing at the lane gate which you had to go through to go into the lot, you have a perfect right to take his explanation along with the other evidence, and see whether he meant wilfully to tell a lie, or was merely not very watchful and keen and shrewd about making his statement.

"A witness who is unskilled and untrained, uneducated, unaccustomed to testifying, and unaccustomed to courts and lawyers and the acuteness of lawyers, will be considered accordingly. Another witness who is sharp and shrewd, educated, skilled and trained as a witness, accustomed to courts and accustomed to the shrewdness of lawyers' questions, will be considered in that light; so you should consider who the witness was and what he was, so as to determine whether consecutively he has spoken the truth or not spoken the truth.

"If the witness testified on a former trial that the defendant Charley Thomas said, 'Let us kill Tom Watts,' and testifies on this trial that the other party said, 'Let us kill Tom Watts,' and that Charley Thomas agreed, and he is assailed for that, you will look, even if the witness makes no explanation of it, you will look to see whether the witness was a man that was calculated to be very watchful and careful in those exact statements, or whether he was a man that would likely make a slip of that kind or not; and if you believe it was a mere slip of the tongue that he said Charley one time and the

other man the other time, that made the proposition about the plot, and you yet believe his testimony, you have a right to do so.

"And then you can further consider, that everybody is capable of making mistakes. It is possible for reporters to make mistakes. It is possible for the judge to make a mistake, when he approves the testimony as being the testimony that a witness testified to. It is possible for a witness to have made a mistake and corrected it afterwards. I cannot say to you who would have more probably made the mistake, whether the court, or the stenographer, or the witness; that is for you to judge according to the testimony. I cannot say to you that the witness would have more probably made it than the court would. I cannot say to you that the court would have more probably made it than the witness would. You will take all that into consideration, the possibility of human mistakes by anybody, by the best of them, and then consider whether that is sufficient reason to show that the witness was false or not, or to discredit the testimony.

"And so you would deal with all the discrepancies and contradictions, or seeming contradictions, that are shown between the statements of the witness on the stand this time and on the stand before according to the brief of the testimony; consider whether the brief of the testimony is absolutely correct or not, or whether the brief of the testimony might not be wrong and the witness correct. You have a perfect right to consider that, because it is possible either one might have been mistaken. The jury is not bound to say that the brief of the testimeny is absolutely correct; the jury must look at it from every standpoint, as reasonable, rational, intelligent, honest men, and determine what the character of the testimony of that witness was, whether it was the testimony of a false witness or a true witness.

" You have the right to look at the general character of the testimony, how far the substantial facts are corroborated, that were testified to before, by the testimony of the witness this time; for instance, to illustrate, if the witness says there was a plot made between Nim Kerce and Charles Thomas some where about those gates, and that plot was that they proposed to kill Tom Watts, and that the manner of the killing should be that Nim Kerce should go on to Charles Thomas's house and Charles Thomas should bring Tom Watts on there,—see how far the substantial plot was adhered to and corroborated that was testified to before, how far it was corroborated by the testimony of the witness that testified again; you have the right to look to it that way; and if there were some discrepancies, such as a little variation between what gate it was, or whether he was in the very act of shelling out corn to the sow, or had finished it and stepped two steps, or not, or whether Charley Thomas first made the proposition or Nim Kerce made it,—you have the right, if you see proper, to look to the substantial plot, and not be governed by any variations or discrepancies on immaterial points, or you may be governed by them if you see proper.

" You have the right to look to all that, and consider his testimony according to the man who gave it in and the circumstances under which he gave it in and the cross-questions which were asked him at the time he gave it in.  You have the right to consider anything he said about being scared or frightened, or how he looked, whether he looked composed or not.  You have the right to consider all that, and from all that and all the other evidence in the case, come to the conclusion whether that witness is a true witness or a false witness."

4. Error was assigned, on the failure of the court to charge as to what constitutes impeachment by contradictory statements made under oath, the effect thereof

on the witness's evidence, and the evidence that would be material to the issue on trial, or anything else under said law; and on the failure to charge that the evidence relied on by the State to convict was circumstantial, and in order to convict on such evidence it should be so strong or convincing as to exclude every reasonable hypothesis except that of the guilt of the defendant.

D. H. Pope, for plaintiff in error.

W. N. Spence, solicitor-general, *contra*.