26778. E. FREDERICS INCORPORATED *v.* FELTON BEAUTY SUPPLY COMPANY INCORPORATED.

Decided July 9, 1938. Rehearing denied July 22, 1938.

*McLarty & Cooper,* for plaintiff.

*A. A. Baumstark, Paul Ginsberg, W. L. Bryan, Carlton Mobley,* for defendant.

MacIntyre, J. E. Frederics Inc. filed suit in Fulton superior court against Felton Beauty Supply Company Inc., upon an open account in the sum of $2886.40 principal, $380.91, interest. The account represented certain beauty-shop supplies sold by the plaintiff, a manufacturer, to the defendant a jobber. The defendant answered, setting up a counter-claim for damages in the sum of $50,000. The answer set up substantially that the defendant "is engaged in the selling of beauty-shop equipment and supplies, engaged as a jobber in said business, buying its merchandise from manufacturers, and selling such merchandise direct to the beauty-shop owners; that the plaintiff herein is a manufacturer of equipment and supplies used by beauty shops, and do not sell direct to such beauty shops, but sell to jobbers, similar to that of this defendant, and such jobbers, in turn, sell direct to the beauty shops; that this defendant has, for the past five years, been doing business with this plaintiff, buying the products of this plaintiff, and in turn selling such products direct to beauty shops in the State of Georgia, and surrounding territory;" that during

the two years before March 1, 1935, it has made a profit of approximately $17,499.42 handling the products of the plaintiff; that during this time it had from time to time between twelve and eighteen traveling salesmen covering Georgia and surrounding territory, selling and displaying plaintiff's products; that during such time defendant made a constant effort to build up a growing trade for the plaintiff's products and did succeed in doing so; that in recognition of this service the plaintiff did, on March 1, 1935, appoint the defendant exclusive distributor for all the products manufactured by the plaintiff, all of which was done by written agreement attached to and made a part of the answer; that the defendant performed its part of the contract until about March 15, 1935, when the plaintiff breached same "by selling its (plaintiff's) products to another dealer within the State of Georgia, to wit, one J. M. Kline, doing business as J. M. Kline Company, Atlanta, Georgia, and did thereafter refuse to do business with or sell this defendant any of its (plaintiffs) products, damaging this defendant; . . that from March, 1933, to March, 1935, defendant did a business with the plaintiff in the sum of $55,227.26, purchasing products of the plaintiff's manufacture in the amount of $55,227.26 list price, selling same at list price of $55,227.26, paying plaintiff the sum of $37,727.84, and making a profit on such business of $17,499.42;" that since March, 1935, in violation of the above agreement, J. M. Kline Company of Atlanta, Georgia, has been handling the products of the plaintiff, and the defendant is informed and believes, and so charges, that during said time the said J. M. Kline Company has made a profit of approximately $1000 per month; that defendant would have made $1000 per month under its contract with the plaintiff; that on April 10, 1935, defendant was indebted to plaintiff in the sum of $1136.44 together with $1614.31 worth of merchandise; that said merchandise consisted of odds and ends which were valueless without other parts which the plaintiff refused to sell to the defendant; that defendant did tender the above amount and the merchandise to plaintiff, which tender was refused; that because of the damage done to defendant by reason of the breach of its contract, defendant alleges that it is not indebted to the plaintiff in any sum.

The contract referred to provided in part as follows: "The party of the second part [defendant] shall be and is hereby des-

ignated and appointed the exclusive selling and distributing jobber of and for the party of the first part [plaintiff] for the sale and distribution of its products throughout the territory hereinafter set forth, excepting, however, all chain shops operating in department stores. It is also understood and agreed that the appointment and designation of the party of the second part as the exclusive selling and distributing jobber in the territory hereinafter mentioned shall not prevent nor in any manner restrict jobbers located in territories other than the territory mentioned and described herein from selling and distributing in said territory the products and equipment of the party of the first part. . . The territorial limits in and for which the party of the second part shall act as the exclusive selling and distributing jobber, as aforesaid, of and for the party of the first part; except as herein otherwise provided, shall be and consist of the following described territory: Georgia." In the contract the defendant agreed to purchase a certain amount of merchandise from the plaintiff during its existence. It was signed "E. Frederics Inc., By J. Edward Dwyer, Vice-President. Felton Beauty Supply Co. Inc., By W. S. Felton, President." The defendant filed several amendments, one of which was as follows: "That during the period beginning March 13, 1935, and ending December 31, 1936, J. M. Kline sold Frederics' products to the amount of list price $59,773.63, net price $39,668.21, on which there was a commission of $20,105.42. . . That the necessary cost to this defendant for expense of selling the aforesaid amount of Frederics' products during the period set out in the above and foregoing paragraph would have been 10 per cent. of the list price, or $5977.36 for salesman's expense, and general overhead expense in the amount of approximately $1000, making a total cost of selling said goods to this defendant in the amount of $6977.36, which when deducted from the aforesaid amount of commission in the sum of $20,105.42 leaves a net loss of $13,128.06." The remaining facts set up by the cross-petition will appear hereafter from a brief resumé of the evidence and in the opinion, where it is necessary to a clear understanding of the ruling made. The plaintiff filed certain demurrers to the cross-petition, some of which were sustained and some overruled. To the judgment overruling certain of the demurrers exceptions are taken. The plaintiff also excepts to the refusal of the court to

grant a peremptory order requiring the production of the defendant's income-tax returns for the years 1933, 1934, and 1935. The defendant admitted the indebtedness sued on by the plaintiff, and on the trial the jury returned a verdict for the defendant in the sum of $13,128.06, less such indebtedness. Exceptions are taken to the overruling of the motion for new trial.

We will not attempt to set out in detail the evidence produced at the trial, for it is quite voluminous. The counter-claim of the defendant rests upon a written contract alleged to have been executed between the parties. The material circumstances leading up to the alleged execution of this contract were as follows: As alleged, it appeared that the defendant had for about five years handled and sold products manufactured by the plaintiff. In the fall of 1934 the plaintiff and the defendant entered into negotiations looking toward the appointment of the defendant as exclusive distributor of the plaintiff's products for the State of Georgia. Theretofore J. M. Kline Company competed with the defendant in the sale of these products. In December, 1934, W. S. Felton, president of the defendant corporation, was in New York City, the principal place of business of the plaintiff, and first talked with Mr. Max Feder, sales manager of the plaintiff corporation, with regard to such a contract. No definite agreement was entered into at this time. Felton left New York "expecting to have this contract," and shortly after his return he wrote to the plaintiff, in part, as follows: "Upon my arrival from New York City, I looked for a copy of the letter which you were to have written to the J. M. Kline Co. and Hoffman Schooley Co., I did not find same, nor did I hear from you at this writing concerning the proposition we talked about while I was in New York City. I refer particularly to the arrangement for the coming year which called for 72 machines and 72 dryers, 12 vaporizers and 500,000 pads, to be purchased by us, during the year 1935, subject, of course, to some final arrangements being made. Will you kindly let me hear from you by return mail, regarding these two matters?" Felton testified: "This letter of January 2d was written by me to Mr. Feder, to remind him that he had not done as he promised when I was in New York, to write to J. M. Kline and Hoffman Schooley Company, in Florida that they could no longer secure Frederics' merchandise, in view of the fact that we

had already entered into an arrangement for the exclusive distribution of their equipment." On January 7, 1935, through Mr. Feder, the plaintiff wrote to the defendant, in answer to the above letter, in part as follows: "This is to acknowledge receipt of your letter of January 2d. In reply wish to inform you that since you left New York City many things have happened in regard to what we spoke about when you were here. Things have been so complicated as far as that territory is concerned that I must seek the advice of Mr. Dwyer. As you know, Mr. Dwyer is away on his vacation, and is expected back either to-morrow or Wednesday. I will take the matter up with him; and while I may not be able to write you in regard to it, I will explain same to you when I arrive in Atlanta Saturday morning."

Mr. Feder came to Atlanta, further negotiations were had, and he promised Felton that he would have the proposed contract ready for him to sign by January 23. On January 25, Felton wrote to the plaintiff, in part, as follows: "You will no doubt recall that we were to have heard from you regarding the arrangement which we consummated for you in Atlanta recently, on or before Wednesday, January 23rd. At this writing we have not yet heard from you, and we will appreciate a prompt response in accordance with our arrangements." On January 31, the defendant telegraphed to the plaintiff as follows: "No reply our letter twenty-fifth, about proposition discussed while in Atlanta. Must have definite answer, as we are planning show March 18th, 19th, and 20th stop. Please telegraph answer, as we are holding up all our plans pending final arrangements with your company." The plaintiff responded on the same date, in part as follows: "Referring to your telegram of even date, please be advised that you will get a definite answer on this proposition by Tuesday, February 5th." On February 7, the plaintiff wrote to the defendant as follows: "Please excuse the delay in answering your letter and telegrams. I know that I promised you an answer on Tuesday, February 5th, but it was the consensus of the entire outfit to think twice before we make an attempt to definitely go through with our proposition with you. We are therefore taking this initial means of informing you that we have definitely decided to accept your proposition, and we would very much like to have this proposition all settled and become effective by February 10th. The purchase figures for this

contract are as follows: Machines 75, Dryers 75, Vaporizers 12, Supplies 500,000. This amount to be divided between the two branches. I do not like to impose on you by asking that you make a trip up here, but I think it would save us a lot of time, and we could definitely sign the agreements and straighten out any difficulties that might be in your mind, or in my mind. As these contracts are to be signed by the President and Secretary of the Felton Beauty Supply Company I would suggest your getting permission to sign, that is, if you are not President and Secretary of your corporation. We are making up these contracts and will undoubtedly have them ready by Saturday of this week. I would very much like to know when you intend to be up in regard to this, so that I will be sure to be in town." To this letter the defendant on February 11, made answer, in part, as follows: "We refer particularly to your communication requesting the writer to come to New York to definitely consummate the proposition referred to. In the first place, the purchase figures incorporated in your letter are incorrect. We have in our possession a slip of paper, upon which you have written in your handwriting, the following: ' 72 Machines, 72 Dryers, 12 Vaporizers, 500,000 Supplies.' We are herewith attaching same for your inspection. If you will think back, you no doubt remember the meeting we had at the Biltmore Hotel, at which was present the Sohmers, you and the writer. At this meeting, you yourself stated that 60 machines would be all that you would ask us to contract for, inasmuch as you did not feel that we could reasonably dispose of a larger number over a period of 12 months. . . Your own suggestion to make the amount of machines, not in excess of sixty, should be the amount incorporated in the contract. Nothing would please the writer more than to be able to handle this matter with you in New York, but, due to very many important matters, it is not possible for me to leave. I see no reason, however, why this matter can not be satisfactorily handled through the mail; and if you will make the necessary corrections above referred to, sending the contract to us, we will, after finding same to be in order, have affixed the signatures of the President and Secretary of our Company and have same forwarded to you. . . We are therefore looking forward to hearing from you by return mail, so that we can bring this matter to a conclusion. . . Thanks a lot for

your co-operation in promising to have Mr. Postell in this city on March 18th, 19th, and 20th."

On February 15, the plaintiff wrote the defendant, declining to reduce the merchandise to the number requested by the plaintiff, but enclosing a proposed contract for execution by the defendant, calling for a purchase of "72 machines, 72 hair-dryers, 12 vaporizers, 500,000 supplies." The entire contents of this letter do not appear in the record. On February 21, the plaintiff telegraphed the defendant, in reference thereto, as follows: "Must have contracts returned immediately properly signed must reach us to-morrow so that we can go ahead with our sales plan advise by wire your acceptance of contracts and also that same are being returned air mail advise about show what hotel and who is going to exhibit." On February 22, the defendant answered, in part, as follows: "This will acknowledge receipt of your letter of the 15th and your telegraphic communication of the 21st. . . We wish to state that the agreement, as it was drawn up, was certainly not definite as it should have been, nor was it clearly written. We were therefore compelled to have our attorney rewrite same, making a few minor changes, which we know will meet with your approval. We are enclosing herewith the contracts as they should be. . . . It is suggested that the agreement be rewritten. . . Will you, therefore, have the agreement rewritten, in accordance with our copies herewith attached, making the necessary changes in the amounts of machines, dryers, and vaporizers, and all the provisions about the co-operation we will receive from your company. Inasmuch as two months of this year have already elapsed, the term of the agreement should be from March 1, 1935, to February 29, 1936. As soon as you have rewritten the agreement, you will kindly forward the copies to us at once, and if after being found correct, we will return them to you." On February 27, the plaintiff, in answer to the above letter, wrote as follows: "Yours of the 22nd at hand, and contents have been noted with interest. In reference to the agreements, we would state that on the minor changes we can agree to some of them, but the others we definitely have to exclude. In reference to the demonstration and instructions, what we mean by the demonstration is there should be at least one big demonstration once a month in Atlanta and in Charlotte under your auspices. The incorporating of the 52 weeks

of the year of instructions and sales held, that's another thing; we can not definitely agree to that, because in the summer months the sales force is reduced to a minimum, and it is not necessary to have the entire summer period. If the contracts are made two weeks out of every month during the summer months, that is good enough. We will change that though to read, where it can be consistently done it will be taken care of. We agree to co-operate to the fullest extent. If it is necessary for the 52 weeks, we will do it. In reference to the stipulation on the amount of business if we discontinue Kline, there has to be some arrangement made to take over his business, and this amount of business that we have asked you to take is not near the full amount. We will not have any worry on your making the amount as outlined; if you put your efforts there, you will be able to handle it and go over it. The figures as outlined in the contract are what we would have to have for an exclusive basis. We have no restrictions on your going down in Florida and selling there, but we are not asking you to assume any of the business we would normally expect there. We are getting our share; and if Hoffman-Schooley can't give it to us, then we can make some other arrangement in Florida. The change from March 1st to the end of February is all right; we will approve that change. We will make the changes as we outlined and shoot it back to you. Kindly sign it pronto, because we want to get working on this and definitely cut off Kline. . . You will have no trouble with the Allens, being that you are on an exclusive basis; but don't try to put the heat on them; you will find they will work with you 100 % and they will be all right."

Felton, president of the defendant corporation, testified that on March 1, he dictated and had mailed, properly addressed and stamped, the following letter to the plaintiff: "We are herewith enclosing your copy of the agreement made between your company and ourselves, which you will find properly executed. We feel certain that you will see fit to co-operate with us by modifying this agreement as previously requested." He further testified that he enclosed in this letter the original contract mailed to him on February 15. Also: "My signature was attached to the contract after Mr. Dwyer's signature was attached to the contract, after Mr. Dwyer's signature was already on there. When the contract came to me it had attached the signature that it now purports to

have attached, ' J. Edward Dwyer, Vice-President ' of Frederics. My signature was not attached until after I received it. This is the contract I am relying on in this case. I did not immediately execute it. I think there were some additional negotiations. Except for attaching my signature to this document, it is in the same form and manner in which I received it. I had the carbon copy that went with it. I received that in the letter of February 15th. . . To the best of my recollection it was February 15th when the original contract was enclosed, that the original contract was enclosed with the letter of February 15th, and was never sent back on the 27th." We will not go into detail concerning the conflicting evidence as to whether this letter, with the contract enclosed, was mailed. Felton testified that the letter was dictated to his stenographer late in the evening of March 1st, and that it was mailed by Mr. Ginsberg, his attorney with whom he had been consulting concerning the contract, the same evening after they had visited the offices of Mr. Ginsberg in the Citizens & Southern National Bank Building. The plaintiff introduced much evidence tending to show that the letter was not mailed as claimed by Felton and the evidence of Dwyer, Feder, and the secretary of the plaintiff to the effect that no such letter with contract enclosed was ever received. The following letter dated March 2, from the defendant to the plaintiff, was introduced: "We are in receipt of your communication of the 27th ultimo, together with the original agreements which were forwarded to us on February 15th. We understand that you are drawing up the agreements as outlined in our communication of the 22nd; and we are therefore awaiting receipt of them." Also letter dated March 4, as follows: "Since writing you on the 2nd, I happened to think, I will be in New York a week from to-day, and that the matters referred to in your letter of the 27th ultimo can be more satisfactorily handled at that time than they can be through the mail." Felton in his testimony explained that the letter of March 2 was dictated in the morning of March 1, to a dictaphone, and that the same was not transcribed by his stenographer until March 2. In the meantime he had dictated the letter accepting the contract. He forgot to cancel this letter, and it was mailed by mistake. As to the letter of the 4th he testified that it referred to agreed modifications to be made in the contract which the

plaintiff by its letter of February 27 requested him to sign, and which he did on March 4, sign and mail to the plaintiff.

Only headnotes 1 through 6 will be enlarged upon.

■ Under the Code, § 20-114, one making by mail an offer requiring only acceptance to create a valid contract, without stating how the acceptance shall be communicated, adopts the mails as his agency, and authorizes transmission of the acceptance by mail, and the contract is complete on deposit of the acceptance in the mail; and this is true though it is never received by the offeror. *Rowntree* v. *Bush,* 28 *Ga. App.* 376 (111 S. E. 217); *Levy* v. *Cohen,* 4 *Ga.* 1 (2); *Bryant* v. *Booze,* 55 *Ga.* 438 (5). Under this principle the evidence authorized a finding by the jury that there was a binding contract between the parties, regardless of whether or not the plaintiff received it. It is earnestly contended by counsel for the plaintiff that this principle has no application in the present case, for the evidence shows without dispute that the plaintiff requested consummation of the contract in person and that it was handled by correspondence upon the suggestion of the defendant. It is insisted that the defendant thereby adopted the mail as its agent, and that the contract was not binding until actually received by the plaintiff. This position is clearly without merit. Since, in order to make a valid and binding contract, it is necessary that there be a "meeting of the minds" of the parties, the theory of the law is that the mail becomes, by express or implied agreement to use the mail to consummate the contract, the agent of both parties. It can make no material difference that the defendant first suggested the use of the mail to consummate the contract, the important feature is that the plaintiff agreed thereto, by sending the defendant a contract through the mail which only required execution by the defendant to make it a completed contract. When, under such circumstances, the defendant actually executed the contract and placed it in the mail, properly addressed, it became binding from that moment.

■ It is true that "An offer, to constitute a contract, must be one which is intended of itself to create legal relations on acceptance; and if it is an offer merely to open negotiations which may ultimately result in a contract, it is not binding." 6 R. C. L. 600. This, however, has no bearing on the present case; for the offer here consisted of a written contract complete in all of its pro-

visions, and certainly was one which was itself intended to create legal relations upon acceptance. In the nogotiations leading up to the submission of the alleged contract to the defendant by the plaintiff and its execution by the defendant, it appears from the plaintiff's communications that it contemplated that the contract be executed by an officer of each corporation authorized to execute its agreements, and by its secretary. The contract had, as it was forwarded to defendant, a place for the signature of each of such officers of the two parties, but was executed only by "J. Edward Dwyer, Vice-President." The position is taken by the plaintiff that under these circumstances the defendant should have known that the plaintiff did not intend to submit the partially signed document as an offer for a contract, and therefore that the execution of the same by the defendant and its deposit in the mail did not constitute a binding agreement. We are unable to take this view of the case. J. Edward Dwyer, general manager and vice-president of the plaintiff corporation, being presumptively authorized to execute contracts in behalf of the corporation, the signature of the secretary was not necessary, and neither was the seal of the corporation necessary, to make the agreement binding. 7 Fletcher on Corporations (per. ed.), 104; *Butts* v. *Cuthbertson* 6 *Ga.* 166, 171. While it may be true, as stated, that the previous correspondence of the plaintiff contemplated that the contract should be executed by the secretary, and even that the seals of the corporations should be used, the plaintiff could certainly waive this formality; and the mere fact that the contract forwarded to it was executed only by Dwyer could not have had the effect of putting the defendant on notice that the plaintiff did not intend that the contract should be binding until returned and the formality of its execution by its secretary and the impressing of the corporate seal thereon complied with. If the contract had expressly so stipulated, a different case would have been presented. In fact, it was not necessary, in order that the contract be binding upon the plaintiff, that even Dwyer should have executed the same. If the contract was mailed to the defendant by a duly-authorized agent of the plaintiff, it constituted a valid offer to contract; and unless the terms of the proposed contract stipulated to the contrary, it became binding on the plaintiff from the time the defendant executed the same and placed it in a letter properly addressed and

stamped. The plaintiff cites 1 Williston on Contracts (2d. ed.), 297, § 94, as follows: "If the receiver of a telegram ought to have known that there must have been a mistake in the wording of the telegram, from his knowledge of the market, or for other reasons, he can not under any view by accepting bind the offeror. And the same principle is applicable in any case where the offeree should know that the terms of the offer are unintended or misunderstood by the offeror." We recognize this as sound law, but it has no application to the facts of the present case. Even if Dwyer made a mistake in signing the agreement, this could not affect the case; for the mere sending it to the defendant constituted an offer to contract, and upon his acceptance it was binding. There is no contention that there was any mistake in the terms of the agreement submitted which should have put the defendant on notice that the terms of the offer were unintended or misunderstood by the plaintiff. So also the case of *Singer* v. *Grand Rapids Match Co.,* 117 *Ga.* 86, 94 (43 S. E. 755), is distinguishable.

■ Where an offer to contract is made, it is the general rule that the offer may be withdrawn at any time before it has been accepted by the offeree. If this be done, no binding contract arises. So also, where the person to whom the offer is made objects to the contract, and suggests that another contract be executed, this amounts to a rejection of the original offer, and such person can not thereafter create a binding contract by accepting the same. However, if the party who made the original offer thereafter renews the same offer, the contract becomes a binding agreement upon acceptance by the offeree. Felton, as president of the defendant corporation, expressly rejected the contract sued on when first mailed to him. He even went so far as to have his own attorney draw up a contract which cured his objections to the original agreement. If nothing else appeared except that afterwards he accepted the contract by executing it and placing it in the mail, properly stamped and addressed, there would be as a matter of law no binding contract between the parties, unless the plaintiff upon receipt thereof assented thereto. However, there appears the plaintiff's letter of February 27, which is subject to the construction that the plaintiff was renewing its original offer and requesting the defendant to sign the same "pronto," and agreeing that it would subsequently execute an agreement modifying this con-

tract which it desired the defendant to sign, so that there would exist a valid and binding agreement from that date for the exclusive distribution of the plaintiff's products by the defendant. We are not able to conclude, as a matter of law, that the jury were not authorized so to find. If they did so find, the contract, when mailed on March 1, properly executed, became binding from that time; and, as above pointed out, this is true regardless of whether the plaintiff actually received the contract.

However, we think it is important to determine whether there was sufficient evidence to authorize a finding that the plaintiff actually did not receive the contract, in order to properly adjudicate the legal effect of the letters dated March 2 and 4, quoted above. Where it is shown that a letter was written and duly mailed, properly addressed, this creates a presumption that it was received by the addressee. *Saunders* v. *Hudson*, 30 *Ga. App.* 732 (119 S. E. 535); *Home Insurance Co.* v. *Head*, 36 *Ga. App.* 779 (138 S. E. 275); *Lowenstein* v. *Johnston*, 23 *Ga. App.* 261 (98 S. E. 111); *Georgia Land Co.* v. *Davis*, 28 *Ga. App.* 398 (111 S. E. 219); *Arnold* v. *Darby*, 49 *Ga. App.* 629 (176 S. E. 914). This presumption is not conclusive, and is rebutted by uncontradicted and unimpeached evidence that the letter was not received. *Cassel* v. *Randall*, 10 *Ga. App.* 587 (73 S. E. 858); *Strauss* v. *Pearlman*, 15 *Ga. App.* 86 (82 S. E. 578); *Citizens Banking Co.* v. *Tootle*, 17 *Ga. App.* 692 (87 S. E. 1098). This arises out of the application of the oft-stated principle that "A fact can not be established by circumstantial evidence which is perfectly consistent with direct, uncontradicted, reasonable, and unimpeached testimony that the fact does not exist." *Neill* v. *Hill*, 32 *Ga. App.* 381 (123 S. E. 30), and cit. The defendant raised the presumption that the contract sued on in the cross-action was received by the plaintiff, by Felton testifying that he enclosed the same in a letter properly addressed and stamped, which was duly deposited in the mail. The plaintiff, however, introduced the testimony of its general manager and vice-president, its secretary, and its attorney, that the letter was not received. Whether or not other evidence was introduced which tended to show the receipt of the contract, to sustain the presumption thus raised, and whether there was sufficient evidence going to the credibility of these witnesses to authorize the jury to disbelieve their testimony, we do not now decide. Suffice

it to say that there was evidence which would have authorized the jury to find that the letter was not received. We assume that the evidence was sufficient, for the purposes of the present decision, for the jury to find to the contrary. We thus proceed with the view that the evidence authorized the jury to find either that the plaintiff did receive the contract or that it did not. The contract in question, according to the evidence of the plaintiff, was executed and posted in the mail on March 1. It appears that the plaintiff received two letters from the defendant in due course of mail, dated respectively March 2 and 4, as above quoted. Both of these letters were apparently written after the date that the defendant contends the contract was accepted. The letter of March 2, the defendant admits, through the testimony of Felton, means nothing more than that at that time the contract here sued on was rejected. The letter of March 4 refers to the letter of March 2, and is subject to the construction that the defendant still rejected the agreement now sued upon.

First, let us consider the legal effect of these letters as if the defendant actually received the contract executed and mailed on March 1. The contract had become binding upon being placed in the mail by the defendant, properly executed; and we do not think that the letters had the effect of abrogating the contract thus sent and received. The plaintiff had the right to insist upon it, and it could only be rescinded by mutual agreement. The letters indicated to the plaintiff either that the contract received was a forgery —mistake—or that the defendant had forgotten the execution of the contract. The receipt of the contract and then the receipt of these letters certainly presented a confusing state of facts. In such circumstances, we do not think that an estoppel would arise against the defendant, where the plaintiff changed its position by thereafter executing the same contract with another, without using ordinary diligence to ascertain the truth. Under such circumstances it is obvious that the plaintiff could have ascertained the real truth of the transaction by merely communicating with the defendant; and we think that under such circumstances it was its duty so to do. However, let us review the case as if the defendant did not receive the contract. The communication of March 2, as pointed out above, was clearly a rejection of the contract forwarded to the defendant on February 15, and the one which is now sued on.

While the defendant explains that the letter of March 4 referred to the modifications which were to be made in the contract it had already executed, it is clearly subject to the construction that at that time it still rejected the agreement sued on; for in this letter it expressly referred to the letter of March 2. It seems clear to us that if the plaintiff had not received the contract properly executed, after its renewal offer on February 27, if the jury should so construe this letter, and thereafter, on March 2, having received a letter from the defendant rejecting this contract, had a perfect right to act thereon, and having done so by executing another contract with Kline, that the defendant can not be heard to set up the execution of this contract on March 1, although in law it became a binding agreement on that date. And in this connection we think it unimportant that none of the officers of the plaintiff testified that they actually relied on these communications in making the contract with Kline, but in their testimony merely denied receipt of the contract. The evidence authorizes, if it does not demand, a finding that the plaintiff executed the contract with Kline in view of and with knowledge of the rejection by the defendant. It is to be presumed that the plaintiff's officers acted in view of their knowledge of all the facts concerning the negotiations with the defendant; and having done so, we are of the opinion that the defendant would be estopped to set up the contract. No negligence or lack of proper precaution can be attributed to the plaintiff in the matter; but the same can not be said of the defendant. If Felton placed it in the power of other employees of the corporation to mail the letter of March 2, the defendant, though innocent of any wrong doing, and not the plaintiff, should bear the loss naturally flowing therefrom. Code, § 37-113. We think that this issue was clearly presented by the evidence. The judge charged the jury that if the plaintiff renewed its offer to contract, and the defendant thereupon executed the same and mailed it properly addressed and stamped, this constituted a binding agreement, and that the defendant should recover the damages sustained by the breach. As we see it, this entirely eliminated from the consideration of the jury the letters above quoted, except upon the issue of whether or not the defendant executed and mailed the contract; and we think this was error. In this view of the case the defendant should be held to its representations made in these letters and

the position there assumed, since otherwise inequitable consequences would result to the plaintiff, which, having the right to do so, acted in view of the same. "The office of a charge by the court is to give to the jury such instruction, touching the rules of law pertinent to the issues involved in the pending trial, as will enable them intelligently to apply thereto the evidence submitted, and from the two constituents law and fact make a verdict." *Thomas v. State*, 95 *Ga.* 484 (22 S. E. 315). The judge should, without request, give in charge to the jury all the law applicable to the issues raised. The charge in the present case failed in the above respect; and we are of the opinion that a new trial should be granted.

■ In *Rice* v. *Caudle*, 71 *Ga.* 605, it was said: "In a suit for compensation, growing out of the breach of a contract under which the plaintiff claimed the exclusive right to sell certain goods at a given price in a designated territory, and in violation of which others were employed to do the work without his consent, when he was ready and willing to carry out his contract, the measure of damages would be the difference between the cost of doing the work and the price to be paid for it; that is, the profits of the enterprise, after deducting the legitimate and actual cost of its execution." In *Walker* v. *Jenkins*, 32 *Ga. App.* 238, it appeared that the defendant entered with the plaintiff into a contract whereby it was agreed that the plaintiff should sell the products manufactured by the defendant in a named territory for one year, at a stated commission upon all orders sent in. The plaintiff brought suit, alleging that the defendant, approximately seven months after the execution of this agreement, breached the same by refusing to allow him to complete the agreement. The petition contained allegations of the amount of sales made by the plaintiff during the seven months he worked under the contract. "Where a contract of the character set forth in the statement of facts is breached by the employer, and the salesman sued for damages alleged to consist in the loss of profits which he would have earned directly under the contract but for its breach, the petition will be held good on demurrer *if it furnishes reasonable data for computation,* and if the loss is such as must have been within the contemplation of the parties when entering the contract. Damages which are the legal and natural result of the breach are not neces-

sarily too remote to be recovered merely because they may be to some extent contingent." (Italics ours.) The court cited numerous authorities for this and held: "Where an agent selling on commission undertakes the sale of an article which is new to the trade, and which is being marketed by a manufacturer previously unknown, and actually solicits and obtains orders for such an article for a period of several months under a yearly contract, and where the employer then breaches the contract approximately five months before its termination, the sales made during the period of time in which the salesman was actually employed may furnish a reasonable basis for estimating the profits which he would have realized under the contract during the remainder of the term, provided the loss thereof arose naturally and according to the usual course of things and is such as the parties contemplated or reasonably might have anticipated when the contract was made, as the probable result of its breach." In *Baldwin* v. *Marqueze,* 91 *Ga.* 404 (18 S. E. 309), it appeared that the plaintiff had been employed for several years by the defendants, to travel in a certain territory and sell their goods. During these years he was paid a salary. It was alleged that in April, 1890, they entered into a contract with him for that year agreeing to pay him, instead of a salary, certain commissions on all goods sold. Shortly thereafter the defendants breached the contract. The plaintiff's petition alleged that his sales would have amounted to a named amount, and that upon such amount his commission would have been approximately $2000.00. Evidence was introduced as to the amount of his sales for the defendants in the previous years when he was working on a salary. The jury returned a verdict for the plaintiff for $800, and the Supreme Court upheld the same.

Again, in *American Agricultural Chemical Co.* v. *Rhodes,* 139 Ga. 495 (77 S. E. 582), it was said: "Where a dealer in fertilizers contracts with a salesman to sell his goods within a designated territory for a given term, and that the salesman shall receive as his commission a certain sum on the number of tons sold, reserving the right to the dealer to pass upon the credit of the customers procured by the salesman, and also upon the amount of tonnage to be sold in that territory, and where the salesman on the faith of such contract and in pursuance of its execution solicits orders for fertilizers and is discharged without cause, the dealer is liable

in damages to the salesman for an unauthorized breach of the contract. . . Where . . the salesman sues for damages alleged to consist of loss of profits which he would have earned directly under the contract for its breach, he may recover them *if the evidence furnishes reasonable data for computation.*" (Italics ours.) See also *Gore* v. *Malsby,* 110 *Ga.* 893 (36 S. E. 315) ; *Parker* v. *Forehand,* 99 *Ga.* 743, 745 (28 S. E. 400). It thus appears that if a contract of the present character be breached, the agent may recover of his principal damages in the form of profits, if the petition and the evidence furnish reasonable data for computation in this regard, and if the loss of such profits was within the contemplation of the parties when entering into the contract. There can hardly be any question that such loss was clearly contemplated by the parties in entering into the contract. It provided for the purchase of certain goods at stated prices, with a stated discount or commission, and further provided that the defendant should be required to buy and pay for a certain amount of said goods. The plaintiff was a manufacturer of the goods, and the defendant was a jobber selling these goods to beauty shops. In such a case the inference is warranted that the profits, though to some extent remote and difficult of exact computation, must have been within the contemplation of both parties when entering into the contract; and where such damages can be reasonably ascertained, they should be recovered. Of course the mere opinion of the agent of how much he would have sold under the contract would not sustain the action. *American Agricultural Chemical Co.* v. *Rhodes,* supra. Nor would a mere general allegation in the petition that the plaintiff would have disposed of so much of the goods be sufficient as against demurrer. *Small* v. *Lee,* 4 *Ga. App.* 395 (61 S. E. 331). However, under the *Baldwin* case, supra, allegations of the amount of goods sold in previous years would make the petition good as against demurrer. So would allegations of the amount of goods sold for the period under the contract breached. *Walker* case, supra. So would allegations of the amounts of the same goods sold for the plaintiff by another, in the same territory, who was given an exclusive contract of sale upon the breach of the contract with plaintiff. *Rice* case, supra. There is no conflict in the *Small* and the *Rice* cases, as contended by counsel for the plaintiff.

The cross-petition in the present case sought to recover profits

that the defendant would have reaped under the contract had it not been breached by the plaintiff. As originally drawn it contained separate allegations, (1) that over the two years preceding the date of the contract the defendant had "made a profit of approximately $17,499.42, handling the products of the plaintiff:" and (2) that the defendant "is informed and believes, and so charges, that during said time the said J. M. Kline Company has made a profit of approximately $1000 per month under its contract with the plaintiff." In the latter respect the petition was finally amended so as to allege "that during the period beginning March 13, 1935, and ending December 31, 1936 [approximately one year and a half], J. M. Kline sold Frederics' products to the amount of list price $59,773.63, net price $39,668.21, on which there was a commission of $20,105.42. That the necessary cost to this defendant for expense of selling the aforesaid amount of Frederics' products during the period set out in the above and foregoing paragraph would have been ten per cent. of the list price, or $5977.36 for salesmen's expense, and general overhead expense the amount of approximately $1000, making a total cost of selling said goods to this defendant in the amount of $6977.36, which, when deducted from the aforesaid amount of commissions in the sum of $20,105.42, leaves a net loss of $13,128.06." In respect to those allegations of the petition referred to in (1) above, the plaintiff demurred on the ground that the sales made by the defendant before the contract sued on were irrelevant and immaterial in a suit for the breach of such contract. This demurrer the judge sustained. We are not called upon to determine the correctness of this ruling. We desire also to point out that the question is not here presented whether the defendant could, under the contract wherein it obligated itself to purchase a stated amount of merchandise, recover the contemplated profit on all of such goods. The petition merely seeks to recover on such an amount as it could be reasonably ascertained would have been sold by the defendant during the term of the agreement. Under the authorities above cited, the judge did not err in overruling the demurrers to those allegations referred to in (2) above. The charge to the jury was in harmony with the principles stated above; and if the plaintiff desired more particular instructions thereon, a written request should have been submitted. We can not agree with coun-

sel for the plaintiff that the defendant should be limited to a recovery of damages sustained only for the period from February to December, 1935, the period covered by the contract. The contract also provided that the defendant should have the option to renew the contract for a year, provided it purchased during the above period the amount of goods stipulated therein, i. e., if it fully complied with its obligations under the contract. The breach of the contract also constituted a breach of the option to renew, which was an integral part thereof, and it does not behoove the plaintiff to say that the defendant would not have fully complied with the contract, performance of which the plaintiff's action prevented.

■ While it is true that parol evidence is not admissible to alter the plain and unambiguous terms of a written contract (Code, § 38-501), yet "All contemporaneous writings shall be admissible to explain each other; and parol evidence shall be admissible to explain all ambiguities, both latent and patent." § 38-502. The contract in question provided that the defendant was thereby appointed "exclusive selling and distributing jobber" of the plaintiff in and for the territory of the State of Georgia; and it is contended that the plain and unambiguous meaning of these provisions is that the defendant was to exclusively sell the plaintiff's products only in the State of Georgia, and that damages for breach of this contract should not be estimated by what the defendant could have sold in other territories. The terms above quoted have no such restricted meaning. The contract provides: "It is also understood and agreed that the appointment and designation of the party of the second part as the exclusive selling and distributing jobber in the territory hereinafter mentioned shall not prevent or in any manner restrict jobbers located in territories other than the territory mentioned and described herein from selling and distributing in said territory the products and equipment of the party of the first part." The most reasonable construction of these terms, when construed with the other parts of the contract, is that the defendant thereunder was to be the only jobber resident in the State handling plaintiff's products. We think that it was entirely permissible to show that it was contemplated by the parties that the defendant should solicit and take orders for goods in States other than Georgia, under the contract. This contention of the plaintiff is without merit.

■ The plaintiff excepts to the exclusion from evidence of a register of names of persons entering or leaving the Citizens & Southern Bank Building, Atlanta, on the nights of March 15, 1935, and March 16, 1935. From the statement of facts it appeared that Felton testified that the letter of March 1, with contract enclosed, was mailed by his attorney, Ginsberg, after they had visited Ginsberg's office in the Citizens & Southern Bank Building that night. The plaintiff introduced as a witness one Champion, who testified that he was night watchman of said building during the month of March, 1935, and that every night beginning at 7 o'clock p.m. he kept a register of all persons entering or leaving the building. He further testified that the register of March 1, 1935, did not contain the name of Paul Ginsberg or that of W. S. Felton. On cross-examination it appeared that this witness testified that he often wrote down the name of a person himself who entered the building without signing, and that every person's name who entered the building after 7 o'clock was put down, so far as he knew. It appears that the register of March 15 had thereon the signature of A. A. Baumstark as well as that of W. L. Bryan, attorneys for the defendant, who had offices in said building, and that the register of March 16, contained the signature of Ginsberg and of Baumstark and wife, the latter in the handwriting of Champion. We can hardly see the relevancy of these documents. The fact that on a subsequent occasion it appears from the register that other attorneys entering the building had signed the register, or that on a subsequent date the name of Ginsberg appeared thereon, and that the name of Baumstark appeared to have on one occasion been written down by the witness Champion, is entirely too weak and inconclusive to illustrate anything on any issue in the case.

*Judgment reversed. Broyles, C. J., and Guerry, J., concur.*

### ON MOTION FOR REHEARING.

MacIntyre, J. Counsel for the defendant in error (hereafter referred to as defendant) takes exceptions only to that part of the opinion containing a ruling adverse to him. It is insisted that we have erroneously applied the principle of estoppel against the defendant, under the facts presented. It is argued that two of the essential elements of equitable estoppel failed to appear in the evidence: (1) That there was any intended deception in the letters of March 2 and 4 (hereafter referred to as the letters), and (2)

that the plaintiff was misled thereby. It is true, as a general rule, that there must have been some intended deception in the conduct or declaration of the person to be estopped; yet negligence often may and does take the place of intended deception. If one be guilty of culpable negligence or negligence amounting to a breach of duty, an estoppel may arise though there was no actual intended deception. What difference can be gleaned, in so far as the ultimate rights of the plaintiff are concerned, whether these letters were sent through negligence, wilful indifference, or with actual intent to deceive, if it has placed itself in a position which it would have not assumed had it known that the facts stated by the defendant in its letters were not true? That there is no difference is illustrated by the principle of the Code, § 38-116. The letters notified the plaintiff that the defendant rejected the contract relied upon. This is squarely inconsistent with the position now assumed, that the defendant had at that time accepted the same. If the plaintiff, after receipt of the letters, executed the same contract with Kline, which it would not have executed had it known that the representations of the defendant were false, we are satisfied, as originally announced, that the defendant would be estopped to deny the truth of the representations made in the letters. There is evidence that shows very clearly that after receiving these letters the plaintiff dealt with the defendant on the assumption that the contract had been rejected, and that no contract existed between the parties. It is true that the evidence for the plaintiff shows that thereafter, to wit, on the 12th of March, a conference was had with Felton, wherein Felton refused to consummate a contract, and that thereupon a contract was entered into with Kline. The position is taken that this evidence demands a finding that the plaintiff did not act on and was not misled by the letters, but that it acted solely on his refusal on the 12th to consummate its agreement. The contract was rejected by these letters. According to the evidence most favorable to the plaintiff, no fact thereafter transpired which called into question the emphatic rejection. The fact that Felton personally, on March 12, refused to enter into the contract, was nothing more than a reiteration of the position taken in his last letters, and is corroborative of the fact that by reason of the letters the plaintiff believed and was acting upon the fact that the defendant had rejected the contract relied upon. We feel

sure that the evidence amply authorized the jury to find that the plaintiff would not have entered into the contract with Kline had it not believed that the defendant had rejected their contract, as per the letters and as apparently reiterated by Felton on the 12th. If the jury should so find, we are of the opinion that the defendant would be estopped to set up the execution of the contract. The jury should have been instructed as to a finding on this state of facts. A failure so to instruct was a denial of a substantive right to the plaintiff.